**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4013-17T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

GEORGE GAYMON, a/k/a
JOSHUA GRENNEN,

     Defendant-Appellant.

_____

Argued telephonically May 26, 2020 –
Decided July 22, 2020

Before Judges Messano and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 14-01-0311 and 15-01-0003.

Zachary Gilbert Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Zachary Gilbert Markarian, of counsel and on the briefs).

Barbara A. Rosenkrans, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex

County Prosecutor, attorney; Barbara A. Rosenkrans, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant George Gaymon appeals from his conviction by a jury of twenty offenses arising out of an armed robbery, two carjackings, a theft of a motor vehicle, possession of weapons, and fraudulent use of credit cards that occurred during a three-week crime spree in March and April 2014. He also appeals from the court's imposition of an aggregate sixty-five-year sentence on those convictions and his convictions for two offenses to which he pleaded guilty under a separate indictment.

Defendant's appeal from his convictions following the jury trial is founded on a singular claim; that the trial court erred by failing to sua sponte hold a hearing to determine his competency to stand trial. He also challenges his sentence, arguing it is excessive and was based on the court's consideration of improper factors. Having reviewed the record in light of the applicable legal principles, we affirm defendant's convictions, vacate his sentence, and remand for resentencing.

A-4013-17T3

I.

In November 2016, defendant had two pending indictments against him. Indictment No. 14-01-0311 charged defendant with third-degree receiving stolen property, N.J.S.A. 2C:20-7, and fourth-degree hindering his own apprehension, N.J.S.A. 2C:29-3(b)(4). Indictment No. 15-01-0003 charged defendant with fifty-eight offenses arising out of a crime spree allegedly conducted with his co-defendant Mario McClain on various days between March 5 and April 2, 2014. The indictment alleged defendant committed armed robberies, two carjackings, theft of three automobiles, and various related theft, conspiracy, and weapons offenses.

Defendant Pleas to Indictment No. 14-01-0311

While jury selection was underway in the trial on Indictment No. 14-01-0311, defendant pleaded guilty to the two charges in the indictment without the benefit of a plea agreement. During the plea proceeding, defendant testified under oath he understood the charges against him and his sentencing exposure. He waived his constitutional rights to cross-examine the witnesses against him and to a jury trial. He provided a factual basis for his guilty pleas to the charges of third-degree receiving stolen property, a motor vehicle, and hindering his own

apprehension by giving a false name to a police officer.  Defendant also expressed satisfaction with the services provided by his counsel.

The court found defendant was "very alert" and "not under the influence of any medication or anything that would impair his ability to understand these proceedings."  The court determined defendant pleaded "freely and voluntarily" with a full understanding of the plea form he completed and signed, and the maximum sentence and penalties that could be imposed.  The court agreed to adjourn defendant's sentencing until the disposition of the charges in Indictment No. 15-01-0003.

The Trial On Indictment No. 15-01-0003

Thirteen months later, defendant's trial on the charges in Indictment No. 15-01-0003 began.  Defendant was represented by the same counsel who represented him during his plea in the prior proceeding.  As the judge attempted to address pretrial issues, including defendant's insistence that he appear at trial in his county jail jumpsuit, defendant repeatedly interrupted.  When the judge told defendant it was not appropriate for him to address the court directly, defendant disagreed, stating he was "the one" against whom "the State has alleged . . . these offenses."  Defendant then instructed the judge not to speak with his counsel and to "speak to [him] direct[ly]" and reminded the court that

4

he "stated previously . . . that [he did] not need counsel." When the judge advised defendant not to interrupt him as he addressed defendant's counsel, defendant again asserted, "[h]e is not my counsel."

The judge told defendant he intended to bring jurors into the courtroom, but defendant interrupted the judge, stating, "[t]here's no – going – to be no jury," and that he did not consent to a jury. The court said it would address only defendant's counsel, and defendant again stated, "[h]e is not – my attorney" and that the court was "depriving [defendant] of [his] rights."

The judge explained that defendant served the court with pro se submissions asserting "claims or defenses" including lack of subject matter jurisdiction, lack of personal jurisdiction, claims arising under the common law writs of mandamus and quo warranto, and defenses under admiralty law, maritime law, and the Uniform Commercial Code. The court also noted "certain judicial decisions and a scholarly article regarding the assertion of the alleged 'flesh and blood' defense" had been provided.[1]

---

[1] The submissions which were marked as court exhibits C-1 through C-8 are not included in the record on appeal. It is unclear from the record whether one of the parties or the court provided the scholarly article and judicial decisions concerning the "flesh and blood" defense. See James Erickson Evans, The "Flesh and Blood" Defense, 53 William & Mary L. Rev. 1361 (2012) (discussing the origins and characteristics of the flesh and blood defense).

A-4013-17T3

The court addressed defendant directly regarding his submissions. Defendant asserted none of the "statutes" applied to him because the court lacked jurisdiction. Defendant declared he was a "blood and flesh" man and a "[s]overeign citizen." Defendant acknowledged he was in a "tribunal" in the "Essex County Court" in Newark, and he asserted that because he was "free born," none of the laws applied to him. Defendant asserted he "never . . . knowingly, willingly – volunteered, [to] waive or agree to have [his] rights infringed upon by this quasi . . . court."

The judge noted that defendant sought to represent himself in a matter in which he could receive a sentence that might keep him in prison for the rest of his life, and that defendant's legal arguments had no merit. Defendant said he did not understand, and that he relied on the arguments in his submissions to the court challenging its jurisdiction and identifying the law that should be applied.[2]

The judge described defendant's pro se submissions to the court as follows: "temporary restraining order, dated March"; "un-prejudiced reservation of rights, dated November"; "[a] lien claim in April"; "[a] cease and desist order in December"; an "[a]ffidavit of denial of corporate existence, dated December";

---

[2] Defendant argued to the court that the laws of Oregon applied and that an unidentified "original bill of rights" applied that defendant explained was different than "the Bill of Rights that protect . . . government officials."

A-4013-17T3

and two letters from defendant to the court. The court asked defendant if those were the submissions upon which he relied in support of his arguments. Defendant did not respond directly and instead stated, "[l]ike I've said in the past – you speak of these [] serious charges . . . therefore serious criminal matter offense[s], whatever." Defendant then stated he did not know what the charges were.

The judge reminded defendant he had been previously arraigned on the charges in open court and his counsel had been provided a copy of the charges. The court informed defendant the charges would be reviewed with him again, but the court first reviewed each of defendant's arguments based on his claim he was a sovereign citizen and his assertion of what defendant described as his "flesh and blood" status. The court provided a summary of the flesh and blood defense; noted defendant's reliance on the defense; and rejected defendant's claims the court lacked subject matter and personal jurisdiction, defendant's requests for writs of mandamus and quo warranto, and defendant's requests for relief under the Uniform Commercial Code and maritime law.

The court next addressed defendant's request to appear pro se. Based on defendant's submissions to the court and prior statements, the court asked if it was defendant's intention "to not accept [his assigned counsel as] his counsel."

In response, defendant stated, "I don't need counsel." The court noted defendant's answer was not responsive and asked defendant if he wanted to represent himself. Defendant responded, "I told you. [] I'm representing myself. I do not need counsel."

Defendant reiterated that he did not know what the charges were, and the court directed the assistant prosecutor read the charges to defendant and, for each, state the maximum sentence that could be imposed if defendant was convicted.[3] When the prosecutor completed the recitation, the court asked defendant to confirm he was aware of the charges. In response, defendant, who had no apparent difficulty hearing the judge's question, said he did not "hear" the prosecutor's recitation. The court, however, found the prosecutor's recitation was clearly audible.

The court also asked defendant if he heard the court's rulings on the defenses and claims made on his pro se submissions, and defendant said, "[n]o." The judge also asked defendant if he would comply with the court's rulings, and defendant again said, "[n]o."

---

[3] The court also noted the State did not intend to proceed against defendant on all the charges in the indictment. The State proceeded against defendant on only twenty-six of the charges in the indictment. The prosecutor's description of the charges against defendant detailed only those charges for which defendant was to be tried by the jury.

The court next addressed defendant's request to represent himself at trial and questioned defendant for the purpose of developing a record on which the request would be decided. In response to the court's inquiry, defendant said he did not understand that if he represented himself "the same laws, rules of procedure, rules of evidence appl[ied] to [him], as would apply to any duly . . . qualified attorney that appears before [the] [c]ourt." Asked if he would comply with the court's rulings during the trial, defendant said, "[n]o."

Defendant admitted graduating from high school and informed the court he had previously represented himself in a criminal proceeding. When asked where he previously represented himself, defendant stated, "[i]n these tribunals." Defendant stated he did not remember entering the plea to receiving stolen property and hindering apprehension in November 2016, and he said he took "psych medication." The court reviewed with defendant his prior criminal convictions, and defendant stated he could not remember whether he was represented by counsel or represented himself in any of them.

Defendant denied knowing the elements of the offenses charged against him, and the court asked how defendant could present a defense to the charges if he was unaware of their elements. In response, defendant asserted the flesh and blood defenses the court rejected at the outset. Defendant argued the laws

9

under which he was charged did not apply to him, the courts operate under the Uniform Commercial Code, and the judge was an "Article One Judge, that's dealing with commerce." The court noted it had already rejected those defenses, and defendant again asserted the charges "don't apply to" him, and said, "[w]hatever it is that you say the charges are, I still don't understand or know what the charges are."

The court reminded defendant the prosecutor had just detailed all the charges against him. The court also explained the jury's purpose was to determine whether defendant would be convicted or acquitted of the charges, and, again, defendant said he did not know what the charges were.

The judge repeated defendant's sentencing exposure on the charges and reminded defendant that if he represented himself and was convicted of all the charges, he faced a sentence of up to eighty years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant said he did not understand. Defendant also said he did not understand the court's statement that he could not talk directly to the jury about the case but that he could elect to testify at trial and be subject to cross-examination. In addition, defendant said he did not understand that if he continued to defy the court's orders, he could lose his right to be physically present during the trial.

When asked if he was familiar with the Rules of Evidence and the rules applicable to criminal procedure, defendant simply answered, "[n]o." He also stated he did not understand that the applicable rules would not be relaxed if he represented himself at trial.

The court rendered an opinion from the bench on defendant's request to represent himself at trial. The court noted that it questioned defendant to address the factors relevant to its determination in accordance with our Supreme Court's decision in State v. Crisafi, 128 N.J. 499 (1992). The court noted defendant's pretrial submissions asserted arguments and defenses consistent with the "so called 'flesh and blood' defense," and the court had "rejected them as a matter of law." The court further noted that the flesh and blood defense is "a legally frivolous argument" because "it simply ignores the law as it currently exists and fails every time."

The court also found defendant made a "conscious decision not to affirmatively respond to [its] inquir[ies]." The court noted defendant disavowed the court's jurisdiction and reserved all rights, but the court then misspoke and inaccurately stated defendant said he "would follow the lawful rulings of the [c]ourt." Alert, and demonstrating a clear understanding of the court's rulings, defendant immediately recognized the court's error and asked, "[y]ou said I am

gonna follow rules?" Moments later, defendant pointed out to the court, "I never said I was gonna follow the rules." The judge thanked defendant for the correction, stating, "I understand that. Thank you for . . . reaffirming that on the record. Because that further supports the [c]ourt's conclusion . . . you would not follow the rules."

The court concluded defendant's intention to assert the flesh and blood defense, his unfamiliarity with the Rules of Evidence and the Rules of Court, and his stated intention of ignoring the court's orders during trial would "virtually guarantee his own conviction of several very serious charges here." The court denied defendant's request to represent himself at trial.[4]

The court next addressed defendant's decision to wear jail garb during the trial. Defendant's counsel advised the court he informed defendant that wearing the jail garb would be "extremely prejudicial to [defendant's] right to a fair trial," and that the jury would "immediately make assumptions about why" he is wearing the garb. Counsel, however, reported that defendant "wish[ed] to wear the jail garb," and, even though counsel "advised him numerous times that he

---

[4] Defendant does not appeal from the court's denial of his request to represent himself at trial, and he makes no argument on appeal that the court erred by denying his request. An issue that is not addressed in a party's initial merits brief is deemed waived. Drinker Biddle & Reath LLP v. N.J. Dep't of Law & Pub. Safety, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011).

needs to put the trial clothes on," defendant "refuse[d] to do so." Counsel confirmed he advised defendant of "the severely potentially prejudicial effect . . . his appearance in jail garb" would have, and defendant "unequivocally represented that he wishes to appear in court wearing" it.

The prosecutor noted that defendant appeared in "trial clothes" at his November 2016 plea proceeding, and the prosecutor asserted defendant chose to wear jail garb at this trial as a stalling tactic. Defendant had no difficulty understanding the prosecutor's argument; defendant asserted the "reason [he] came dressed [at his plea was] [be]cause they told me at the jail to put that on."

The court directed defendant to abide by its prior instruction not to address the court directly and to communicate through his counsel. Defendant defiantly said he would continue to speak "directly to" the judge because there "is nothing . . . prohibiting [him] from speaking directly to" the judge.

The court instructed defendant that his continuing defiance of the court's order that he not speak directly to the court could result in a sanction because the court was required to "preserve the integrity of [the] proceeding." The court reiterated that it denied defendant's request to represent himself, and that defendant would not be permitted to address the court or the jury directly, but instead must address the court through his counsel. Defendant said he did not

13

understand the court's decision and directive, and he continued to speak to the court directly.

Defendant continued to direct comments to the court, and the court took a break in the proceedings to permit defendant and his counsel to confer and discuss whether defendant wished to change out of the jail garb and into trial clothes. Later, defense counsel reported to the court he had advised defendant to wear "trial clothes" but defendant "indicates that he's refusing." Defendant asked the court what the trial clothes were for and what he was "participating in," and the court reminded defendant he was ordered not to address the court directly. Defendant responded, stating "I'm gonna continue to speak to you directly. I told you that." Defendant also said, "I told you. I'm here; I don't speak to someone else to speak to the person that I'm talking to."

The prosecutor explained he had been in court on multiple occasions with defendant during the proceedings in the case, and that defendant never before had difficulty conversing with the court or the prosecutors. The prosecutor characterized defendant's sudden claims he did not understand the charges as "playing" and a "brand new" "tactic" to delay his trial, "to get evaluated or to claim something." The prosecutor noted that in all prior proceedings defendant "has been able to articulate and . . . proceed." The prosecutor noted defendant

pleaded guilty in November 2016 "and was able to articulate facts and was able to understand everything."

Defendant asserted that his prior plea was "because of cohersion [sic] and threats," and the court found defendant's "reference back to that proceeding supports the suggestion made by the State . . . that [defendant was] engaged in some sort of a delay tactic, or a malingering tactic to forestall the jury trial" in this case. The court told defendant, "[t]hat tactic is not going to work."

Defendant continued to direct comments to the court, and he was undeterred by the court's numerous requests and orders that he stop doing so. Defendant refused to communicate with the court through his counsel and told the judge, "[m]y communication is directly to you," indicating he would continue to make statements directly to the judge during the trial.

When the court reiterated that defendant was represented by counsel, defendant pointed out he sent the court a document stating "all rights reserved, UCC 301." The court questioned defendant about the document, and defendant explained "UCC" meant "Uniform Commercial Code," which he asserted is "the system that this court[] operate[s] under." Defendant further claimed the court was "trying to sell the copyright of a statute and trying to merge that against [his] blood and flesh, [to] which [he did] not consent." The judge explained the

15

Uniform Commercial Code Section 301 applied to the reservation of rights in the performance of a contract for the sale of goods, but defendant asserted the provision was applicable to his case because he was "converted into a trust," a "[c]orporate fiction [sic]" and "[g]overnment only has lawful jurisdiction over corporate fictions [sic]. Not blood and flesh."

Defendant continued to ignore the very patient court's requests and orders that he not address it directly. The court determined defendant's defiance of the orders constituted a "conscious, intentional decision to waive his right to be physically present before the court" and directed that he not be physically present at trial. The court found defendant's "repeated unwillingness . . . to comply with the order of the [court] . . . that he communicate through counsel, and his . . . representation . . . he will directly communicate to the [c]ourt, even when there's a jury . . . represents an unequivocal waiver of his right to be physically present at . . . trial." The court arranged for defendant to listen to the proceedings and communicate via computer with his counsel in real time during the trial, and to explain defendant's physical absence from the trial to the jury.[5]

---

[5] Defendant does not challenge on appeal the court's finding defendant should be physically removed from the court during trial or the arrangements made by the court to facilitate defendant's access to the proceedings and his trial counsel from a remote location during trial. The argument is deemed waived. Drinker Biddle & Reath LLP, 421 N.J. Super. at 496 n.5.

The following day, defendant refused to leave his cell at the county jail to be transferred to the courthouse for his trial. He was extracted from his cell and brought to the court, where the judge asked defendant if he planned to continue to defy the order that he not directly address the court. Defendant did not respond to the court's inquiry, and the court and defendant's counsel construed defendant's refusal to respond as an affirmation that he would continue to address the court directly if present in the court during trial. The court reaffirmed that arrangements were made allowing defendant to hear the proceedings and communicate with his counsel via a computer from a nearby cell.

Later, jury selection was interrupted because defendant made statements from the nearby cell that could be heard in the courtroom. The court interrupted jury selection and, in defendant's presence, discussed defendant's statements with counsel. Counsel and the court explained defendant's statements were heard in the courtroom. For example, defense counsel reported he heard defendant say, "[y]ou're violating my rights," and the prosecutor stated he heard defendant say, "I didn't waive my rights." Counsel agreed the prospective jurors were able to hear defendant's statements.

17

The court asked defendant if he would continue "to speak out [from his location] while the jury is in [court]room?" Defendant responded, "[y]es, my rights are being violated." Defendant explained his position, "[l]ike I said previously[,] . . . I've reserved my rights . . . . I do not consent to none of these proceedings."

The court asked if it would be "fair to say" that defendant would continue to conduct himself as he had "over the last several days," and defendant explained, "I'm not consentin' to none of this." Defendant further explained he would "continue to defend [himself] and argue that – what you all are doing is wrong," and he would "basically keep – not consentin' to these court proceedings."

Defendant reaffirmed his intention to be defiant and disruptive. He told the court, "I will continue to deny the [c]ourt's actions, jurisdiction, etcetera." He also declared he would "continue to object, refute, abate – all of that." Leaving no doubt he recognized and understood his conduct was not only disruptive but was intentionally undertaken for the purpose of interrupting the trial, defendant told the court, "[m]y disrupting is not – it's me not consenting to what's going on."

The court excused the jurors who heard defendant's statements and selected a jury from another panel of prospective jurors. The location from which defendant was able to hear the proceedings and communicate with his counsel via computer was moved so that any statements defendant made in his effort to disrupt the trial could not be heard in the courtroom.

The trial proceeded in defendant's absence. In summary, the evidence showed that on March 24, 2014, defendant pointed a handgun at a gas station attendant, who turned over money in response to defendant's demand. Defendant then joined his co-defendant, McClain, who was waiting nearby in a stolen motor vehicle, a Dodge Intrepid. The robbery was recorded on a security camera, and at trial McClain admitted his participation in the robbery, identified defendant as the individual threatening the attendant with the handgun, and explained he and defendant had stolen the vehicle in which they escaped.

The evidence also showed later that day, defendant drove the Intrepid into the rear of another vehicle, an Infiniti. Defendant then exited the Intrepid, approached the Infiniti, and displayed a handgun and knife. Defendant ordered the driver of the Infiniti out of the vehicle, and defendant entered the Infiniti and drove off. Again, McClain testified at trial concerning this carjacking and his and defendant's involvement in it.

 A-4013-17T3

Three days later, defendant and McClain drove the stolen Infiniti into the rear of another vehicle, a Mercedes Benz. At gunpoint, defendant and McClain carjacked the Mercedes Benz and drove off in it. McClain described at trial defendant's and his participation in the carjacking. The trial evidence also showed defendant used the credit cards stolen from the driver of the Mercedes Benz to make purchases at various retail stores.

Following presentation of the evidence, counsel's closing arguments, and the court's instructions on the law, the jury found defendant guilty of: conspiracy to commit first-degree robbery and first-degree robbery; two separate conspiracies to commit two carjacking's; two carjacking's; three counts of unlawful possession of a handgun and possession of a handgun for an unlawful purpose; possession of a knife for an unlawful purpose; theft of a motor vehicle; receiving stolen property, a motor vehicle; conspiracy to commit credit card fraud; and four counts of credit card fraud.

At sentencing, the court explained it received a submission from defendant in pertinent part claiming that he entered his November 9, 2016 plea based on "coercion and threat tactics." Defendant claimed his counsel, the prosecutor, and the plea judge had "full knowledge that [defendant] was not in [his] own state of mind and that [he] was . . . under heavy psychiatric medication

A-4013-17T3

for [his] depression, anxiety[,] and stress."  Defendant asserted the individuals "conspired with another" and placed him under duress.

Defendant's counsel informed the court that he spoke to defendant about the submission and understood defendant sought to withdraw his November 9, 2016 plea.  Defendant's counsel also explained he represented defendant at the plea, and there were "extensive discussions" about the plea, defendant "brought to [counsel's] attention that he wished to plea," and counsel "had no reason to believe that it was not voluntary."

The court addressed defendant's putative application to withdraw the plea, rejecting defendant's claim his status as a sovereign citizen required granting the requested relief.  The court explained it rejected defendant's request to withdraw his plea based on his claimed sovereign citizen status for the same reasons it previously rejected defendant's arguments and defenses based on the status when the trial commenced.

The court addressed defendant's request to withdraw his plea under the factors explained by the Court in State v. Slater, 198 N.J. 145, 157-58 (2009). The court noted defendant made no claim of innocence, and the court explained it reviewed the plea form completed by defendant on November 9, 2016, and

listened to the recording of the plea proceeding.[6] The court observed that on the plea form defendant responded in the negative to question asking if defendant had been threatened into pleading guilty, and defendant responded in the affirmative to the question asking if he was satisfied with the services of his plea counsel. Thus, the court concluded the reason defendant proffered for the requested withdrawal of the plea—that he pleaded under duress and threats—was undermined by defendant's sworn representations when he pleaded.

The court further found the plea was entered pursuant to a plea agreement and the State would suffer prejudice if the plea was withdrawn. The court therefore denied defendant's putative motion to withdraw his November 9, 2016 guilty plea.[7]

The court proceeded to sentence defendant on the two charges to which he pleaded guilty and the twenty charges for which he was convicted at trial. The court noted the presentence investigation report included "a reference . . .

---

[6] The court also played the recording of the November 9, 2016 plea proceeding during the sentencing proceeding following his trial.

[7] Defendant does not appeal from the court's denial of his motion to withdraw his November 9, 2016 guilty pleas to the two charges in Indictment No. 14-01-0311.

regarding mental health. Poor mental health."[8] The court asked counsel if he had any reason to question defendant's competency during the case in which defendant pleaded. Counsel advised the court he did not "see anything" during his interactions with defendant in that matter suggesting defendant was not competent. Defense counsel also informed the court he did not perceive anything during the trial suggesting defendant was not competent. The court observed that the recording of the plea proceeding showed defendant was alert and cooperative in that matter.

The court requested that the prosecutor detail the plea negotiations that took place in the case that went to trial. The prosecutor explained there were extensive plea negotiations, with defendant's active participation, including making counteroffers to those proposed by the State. The State made a final offer of twenty years just prior to the commencement of jury selection, which defendant indicated was acceptable with the condition that he be released from custody pending sentencing. The State rejected the offer because it would not

---

[8] Defendant refused to be interviewed for a presentence investigation report following his convictions by the jury at trial. The presentence investigation report, however, stated that during defendant's December 2016 interview for the presentence investigation report following his November 9, 2016 plea, defendant self-reported he is "bipolar," has a "split personality," had two one-month hospital admissions in 2003 and another one-month hospital admission in 2006 "for mental health," and takes "various meds for mental health."

A-4013-17T3

allow defendant's release pending sentencing. Thus, the court found there were communications about resolving the case through a negotiated plea up until jury selection was to begin, and the court noted, without objection from defense counsel, that defense counsel would not have engaged in those negotiations without defendant's authorization.

The court stated throughout the trial it was aware that if it had a bona fide doubt about defendant's competency to proceed to trial under N.J.S.A. 2C:4-4, it was required to order further proceedings on the issue of defendant's competency. The court explained, however, the course of the plea negotiations through the commencement of jury selection "demonstrated an ability [by defendant] to participate in the presentation of his defense and engage[] in negotiations."

The court further found that during the colloquy with defendant during the Crisafi hearing, defendant elected to rely on his written submissions and would not provide responsive answers to the court's questions. The court determined defendant's actions did not reflect a lack of comprehension, but instead constituted "a tactical decision not [to] engage in a pointed inquiry that would result in the . . . record that would reject [his] position."

  A-4013-17T3

Defense counsel represented to the court his interactions with defendant never provided any reason to question defendant's competency to stand trial. Defense counsel said:

> Your Honor, I'd just like to reiterate, I have never seen any reason for the [c]ourt to order a competency evaluation. I have dealt with [defendant], I have represented him for – I believe it's about four years right now. I have had numerous interactions with him at the County Jail, in person, Your Honor. I have never seen anything that would require a competency evaluation, Your Honor.

The court also explained that its determination defendant could not represent himself at trial was not based on a finding defendant was unable to understand what was going at the trial, but instead was founded on a determination defendant would not abide by the court's order that he speak through his counsel. The court further noted that its concern about defendant's unwillingness to comply with its orders was validated when, after defendant was removed from the courtroom and relocated to a nearby cell, he made inappropriate comments for the purpose of tainting the jury. The court also observed that defendant's pretrial submissions, comments, and conduct in the courtroom at the outset of the trial were consistent with the "'sovereign citizen' belief system" and not evidence of a lack of competence to stand trial or be sentenced.

A-4013-17T3

The court reviewed the circumstances attendant to the robbery, carjackings, and other crimes for which defendant was convicted, as well as defendant's significant prior criminal history.[9] The court found aggravating factors three, the risk defendant would reoffend, N.J.S.A. 2C:44-1(a)(3); six, the nature and extent of defendant's prior record, N.J.S.A. 2C:44-1(a)(6); nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9); and thirteen, the defendant used or possessed a stolen motor vehicle during the commission of the crimes, N.J.S.A. 2C:44-1(a)(13). The court further determined there were no mitigating factors and, after weighing the factors, concluded the aggravating factors preponderated over the non-existent mitigating factors.

Based on those findings, the court imposed a five-year sentence on the third-degree receiving stolen property charge under Indictment No. 14-01-0311 and a concurrent time-served sentence of 1,452 days on the fourth-degree hindering charge.

---

[9] Based on defendant's criminal history, he was eligible for extended term sentences as a persistent offender under N.J.S.A. 2C:44-3. For reasons it expressed during the sentencing proceeding, the court denied the State's motion for imposition of an extended term sentence.

The court explained the crimes for which defendant was convicted under Indictment No. 15-01-0003 were committed while he was on pretrial release on the charges in Indictment No. 14-01-0311, and, as such, there was a presumption the sentences on the former indictment would run consecutive to the sentence imposed on the latter. See N.J.S.A. 2C:44-5(h). Nonetheless, the court engaged in an analysis under State v. Yarbough, 100 N.J. 627 (1985), to determine if consecutive or concurrent sentences should be imposed on the sentences on the separate indictments, as well as those in Indictment No. 15-01-0003.

Applying the Yarbough standard, the court found the crimes charged in the two indictments were committed at wholly different times and involved different victims, and therefore the sentences imposed on the two indictments should be consecutive. With regard to the crimes for which defendant was convicted under Indictment No. 15-01-0003, the court found the robbery of the gas station attendant and the two carjackings also constituted distinct acts and involved separate victims, incidents, and separate acts of violence. Thus, the court determined consecutive sentences were appropriate for defendant's commission of those offenses.

The court sentenced defendant to a twenty-year term on the first-degree robbery charge subject to NERA's requirements, consecutive to the sentence

27

imposed under Indictment No. 14-01-0311. The court imposed a thirty-year consecutive sentence on the March 24, 2014 carjacking. Noting that McClain was the more active participant in the March 27, 2014 carjacking and considering the overall length of the aggregate sentence to be imposed, the court imposed a ten-year consecutive term on that charge.

The court found all the other offenses either merged with the offenses for which the court imposed the custodial terms, or it imposed concurrent sentences on the convictions that did not merge. Thus, the court's aggregate sentence on the two indictments was sixty-five years, with sixty years subject to the requirements of NERA. This appeal followed.

Defendant presents the following arguments for our consideration:

> POINT I
>
> [DEFENDANT'S] RIGHT TO A FAIR TRIAL WAS VIOLATED BECAUSE THE TRIAL COURT FAILED TO ORDER A PSYCHIATRIC EXAMINATION TO DETERMINE WHETHER HE WAS COMPETENT TO STAND TRIAL.
>
> A. Evidence Raising "Bona Fide Doubt" as to [Defendant's] Competence.
>
> B. The Court Violated [Defendant's] Right to Due Process by Failing to Order a Psychiatric Evaluation to Ensure He Was Not Tried While Incompetent.

POINT II

[DEFENDANT'S] SENTENCE IS EXCESSIVE BECAUSE THE COURT IMPROPERLY WEIGHED HIS PRO SE FILINGS AGAINST HIM IN AGGRAVATION AND FAILED TO JUSTIFY ITS IMPOSITION OF CONSECUTIVE MAXIMUM SENTENCES.

II.

Defendant presents a singular argument in his appeal from his convictions of twenty offenses following his trial.  He argues the court erred by failing to sua sponte order a psychiatric examination to determine whether he was competent to stand trial.  Defendant does not contend he was not competent to stand trial; he asserts only that the court was presented with information raising a bona fide doubt about his competency and, for that reason, the court should have ordered a psychiatric examination to determine his competency.

We first consider the legal principles governing defendant's argument. The Due Process Clause of the Fourteenth Amendment prohibits states from trying, convicting, or sentencing mentally incompetent defendants.  Pate v. Robinson, 383 U.S. 375, 378 (1966).  A court's failure to invoke "procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." Drope v. Missouri, 420 U.S. 162, 172 (1975); see also State v. Purnell, 394 N.J.

Super. 28, 47 (App. Div. 2007); State v. M.J.K., 369 N.J. Super. 532, 547 (App. Div. 2004).

Consistent with a defendant's due process rights, our Criminal Code provides that "[n]o person who lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as such incapacity endures." N.J.S.A. 2C:4-4(a). A person is considered mentally competent to stand trial on criminal charges if the proofs satisfy the requirements of N.J.S.A. 2C:4-4(b). See State v. Gorthy, 226 N.J. 516, 531-32 (2016). At a minimum, the defendant must have sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him or her. Purnell, 394 N.J. Super. at 47 (citing Dusky v. United States, 362 U.S. 402, 402 (1960)). "In New Jersey, the test for competence to stand trial on criminal charges [is] [ ] codified in N.J.S.A. 2C:4-4." M.J.K., 369 N.J. Super. at 547-48.

A court may sua sponte "'appoint at least one qualified psychiatrist to examine and report upon the mental condition of the defendant' whenever a defendant's fitness to proceed appears questionable." State v. Harris, 181 N.J. 391, 457-58 (2004) (quoting N.J.S.A. 2C:4-5(a)). Where, as here, a defendant

A-4013-17T3

challenges a court's decision not to sua sponte order a competency examination, our standard of review "is a strict one." Id. at 458 (quoting State v. Spivey, 65 N.J. 21, 37 (1974)); see also M.J.K., 369 N.J. Super. at 548 (describing "our role in reviewing the decisions of a trial judge respecting competence as 'typically, and properly, highly deferential'" (quoting State v. Moya, 329 N.J. Super. 499, 506 (App. Div. 2000))). A court's failure to exercise its authority to order a competency evaluation "will not be reviewed on appeal, unless it clearly and convincingly appears that the defendant was incapable of standing trial." Spivey, 65 N.J. at 37 (quoting State v. Lucas, 30 N.J. 37, 73-74 (1959)). In order to satisfy "[t]he 'clear and convincing' standard of review" on appeal, a defendant must show a "'bona fide doubt' as to [his] competence to stand trial." Ibid. (citing Pate, 383 U.S. at 385) (alteration in original).

"The evidence necessary to establish the requisite bona fide doubt as to a defendant's competence is difficult to articulate . . . ." State v. Lambert, 275 N.J. Super. 125, 129 (App. Div. 1994). "[T]here are 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed.'" Gorthy, 226 N.J. at 530 (quoting Drope, 420 U.S. at 180). In Drope, the United States Supreme Court explained, for example, that "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical

opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient." 420 U.S. at 180. The "'[m]ere suggestion' of incapacity is not sufficient," Spivey, 65 N.J. at 36, and a court is not required to conduct a competency hearing "in the absence of . . . substantial evidence of the existence of a degree of mental disorder which would unfit the defendant from conducting his cause or instructing his counsel," id. at 36-37 (citations omitted).

The clear and convincing standard of review of a court's decision not to sua sponte hold a competency hearing "is consistent with the view that defense attorneys are in a better position to assess a defendant's competency . . . ." Harris, 181 N.J. at 458. Counsel's failure to raise the issue of competency weighs against a finding there was clear and convincing evidence a defendant is incompetent because "judges must depend to some extent on counsel to bring [these] issues into focus." Ibid. (alteration in original) (quoting Drope, 420 U.S. at 176-77). "[B]ecause defense attorneys are in a better position than the trial court to question a defendant's competency, the fact that [counsel finds] no reason to question [a defendant's] competency must be given substantial weight" in determining whether a hearing was required. Ibid. A court is not required to

accept counsel's representations concerning a defendant's competency but "a lawyer's representations concerning the competence of [a] client, . . . is unquestionably a factor which should be considered." Drope, 420 U.S. at 177 n.13 (citations omitted).

Measured against these standards, we do not discern any basis to reverse defendant's convictions based on any purported error by the trial court in not sua sponte ordering a psychiatric examination to assess defendant's competency to stand trial. Defendant fails to demonstrate there was clear and convincing evidence he was incompetent to stand trial, and the record before the trial court did not establish a bona fide doubt about defendant's competence to stand trial. See Spivey, 65 N.J. at 37.

We begin by noting defendant's counsel represented defendant over a four-year period in two separate criminal proceedings and found no reason to suggest defendant was not competent to stand trial. Counsel never raised the issue of defendant's competence on his own, and, when questioned by the court, he affirmatively represented that during his representation of defendant in the initial case in which defendant pleaded guilty, as well as the case that was tried, he found nothing in his interactions with defendant suggesting defendant was incompetent. The court could reasonably infer from counsel's decision never to

request a competency hearing, and his affirmative representations to the court, that counsel determined defendant was able to communicate to him about the case during trial and to assist in his own defense. See Dusky, 362 U.S. at 402 (explaining, in part, the standard for determining competency to stand trial is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding").

We are mindful that defense counsel's perception of defendant is not dispositive of the issue of defendant's competence, Harris, 181 N.J. at 458, but the court did not err in relying on defense counsel's decision not to raise the issue and counsel's affirmation that there was no basis to challenge defendant's competence as weighing heavily against any bona fide doubt as to defendant's competency during trial. "It is to be ordinarily expected that defense counsel, who is in a far better position than the trial judge to assay the salient facts concerning the defendant's ability to stand trial and assist in his own defense, would originate the request that such an inquiry be conducted." Spivey, 65 N.J. at 37 (quoting Lucas, 30 N.J. at 73-74). Counsel's view of defendant's competence can be properly afforded "substantial weight." Harris, 181 N.J. at 458.

Moreover, the record before the court showed that defendant demonstrated his understanding of the proceedings, the pendency of the charges against him, and that he would be tried in a court before a jury. He filed a series of pro se requests for relief with the court, including requests for dismissal of the charges and the proceedings founded on claims that the court lacked subject matter jurisdiction and personal jurisdiction. He also sought leave to act as his own attorney during trial. In other words, defendant not only expressly sought dismissal of the charges, he also asserted that if the charges were not dismissed, he should be permitted to represent himself before the jury at trial. To be sure, and as the trial court fully addressed and explained, defendant's arguments supporting his requests were based on misconceptions about, and misinterpretations of, the applicable law. His requests, however, reflected a clear and cogent understanding of the proceedings against him; he asserted defenses to the court's jurisdiction to conduct the trial and asserted a meritless, but mindful, strategy to obtain a dismissal of the charges before the trial began. His actions belie any claim the court was presented with a bona fide doubt about his competence.

The record also shows that until the commencement of the trial, defendant actively participated with his counsel in attempting to resolve the charges

against him with a plea bargain. If the State had accepted the conditions he offered, it can be reasonably inferred defendant was willing to plead guilty to certain charges in order to minimize his sentencing exposure and end the case before trial. Indeed, through a series of offers and counteroffers exchanged between the State and defendant, it appears the matter would have been resolved but for the State's rejection of defendant's request that his plea be accepted on the condition he be released from custody pending sentencing. Defendant's interactions with his counsel to almost bring the matter to a negotiated resolution confirms his understanding of the charges, his ability to interact and communicate with counsel, and his recognition that if he did not accept the State's final plea offer, the matter would proceed to trial before a jury.

Defendant's pretrial submissions to the court, and his statements and actions in the court once the trial began, expressed his intention to rely on his status as a purported sovereign citizen and the sovereign citizen's flesh and blood defense to the charges against him. Defendant's misguided reliance on the principles espoused by individuals adopting the sovereign citizen philosophy in response to the proper prosecution of criminal offenses is nothing new. Courts have uniformly rejected the claim defendant makes here; that espousal of meritless and nonsensical sovereign citizen defenses, reliance on sovereign

citizen's beliefs and principles, and trial conduct consistent with those beliefs and principles, created a bona fide doubt about his competence to stand trial. In United States v. Neal, the Ninth Circuit Court of Appeals found:

> It is not disputed that [the defendant] made numerous comments and filed a variety of documents disputing jurisdiction and other "nonsensical" issues (e.g., [the] United States is a corporation. . . . as a corporation it cannot interact with human beings; "the sale of bonds based on Petitioners [sic] conviction by the court creates a financial conflict of interest".). However, [the defendant] also professed a "sovereign citizen" belief system. His comments and conduct were indicative of that belief, not a lack of competence. [The defendant] cannot now use those beliefs as an expression of incompetency. "In the absence of any mental illness or uncontrollable behavior, [the defendant] had the right to present [his] unorthodox defenses and argue [his] theories to the bitter end."
>
> [776 F.3d 645, 657 (9th Cir. 2015) (emphasis added) (footnote omitted) (quoting United States v. Johnson, 610 F.3d 1138, 1147 (9th Cir. 2010)).]

Similarly, in United States v. Brown, the First Circuit Court of Appeals found a proclaimed sovereign citizen's meritless legal arguments, "did not evidence confusion on [the defendant's] part about the legal proceedings against him, but rather reflected firmly held, idiosyncratic political beliefs punctuated with a suspicion of the judiciary." 669 F.3d 10, 18 (1st Cir. 2012); see also United States v. DiMartino, 949 F.3d 67, 73 (2d Cir. 2020) ("agree[ing] with

other circuits that have held that political views derived from tax protester movements—however they appear to the uninitiated—are not, by themselves, sufficient evidence of mental incompetence"); United States v. Gooch, 595 Fed. App'x 524, 527-28 (6th Cir. 2014) (finding the defendant's use of "the incomprehensible babble of . . . the 'Sovereign Nation'" did not provide grounds to question the defendant's competence because "delusional and irrational" tax-protestor beliefs are irrelevant to the defendant's competence); United States v. James, 328 F.3d 953, 955-56 (7th Cir. 2003) ("Many litigants articulate beliefs that have no legal support . . . . Sometimes these beliefs are sincerely held, sometimes they are advanced only to annoy the other side, but in neither event do they imply mental instability or concrete intellect so deficient that trial is impossible. . . . One person with a fantastic view may be suspected of delusions; two people with the identical view are just oddballs.").

Defendant's reliance on his status as a sovereign citizen and the flesh and blood defense in his pretrial submissions provided context for the court's consideration of whether his conduct at trial established a bona fide doubt about his competence. Defendant's refusal to comply with the court's orders, his refusal to provide responsive answers to the court's questions, and his self-serving claims he did not understand the charges or what was occurring in the

court were properly viewed as consistent with his view the court had no personal or subject matter jurisdiction over him based on his status as a sovereign citizen.

Defendant's conduct did not demonstrate incompetence, and he told the court so. As noted, he provided a cogent and unequivocal explanation of his conduct that is consistent with the court's decision there was no basis to question defendant's competency: he declared he would "continue to deny the [c]ourt's actions [and] jurisdiction" and "continue to object, refute, abate – all of that" because his "disrupting" was "[him] not consenting to what's going on." In other words, defendant admitted the actions and conduct he now contends created a bona fide doubt about his competence were undertaken for the intended purpose of interfering with the orderly conduct of his trial.

In sum, based on all the circumstances presented, there is no basis to conclude the record before the trial court established a bona fide doubt about defendant's competence. The court did not err by failing to sua sponte order a psychiatric exam of defendant to determine his competence.

III.

Defendant also appeals from his sentence. He claims that the court erred in imposing the aggregate sixty-five-year sentence by improperly finding and weighing aggravating factor nine, and by failing to justify its imposition of

consecutive maximum sentences on the receiving stolen property charge to which he plead, the first-degree robbery charge, and the March 24, 2014 carjacking offense for which he was convicted at trial.

We review a "trial court's 'sentencing determination under a deferential [abuse of discretion] standard of review.'" State v. Grate, 220 N.J. 317, 337 (2015) (quoting State v. Lawless, 214 N.J. 594, 606 (2013)); see also State v. Pierce, 188 N.J. 155, 169-70 (2006) ("On appellate review, the court will apply an abuse of discretion standard to the sentencing court's explanation for its sentencing decision within the entire range."). We affirm a sentence if: (1) the trial court followed the sentencing guidelines; (2) its findings of fact and application of aggravating and mitigating factors were "based upon competent credible evidence in the record"; and (3) the application of the law to the facts does not "shock[] the judicial conscience." State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). When reviewing a trial court's sentencing decision, we will not "substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014).

Defendant argues the court erred by finding aggravating factor nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). The court found aggravating factor nine based on defendant's

continuing course of criminal conduct reflected in his significant juvenile and adult records. The court also noted defendant's adherence to the "sovereign citizen doctrine" and explained it had no validity in our legal system. The court found there was a need to deter others from engaging in the type of criminal conduct that led to defendant's conviction, and also there was a need to deter others from adhering to the sovereign citizen doctrine.

We agree with defendant's claims the court erred by finding a need to deter others from adhering to the sovereign citizen doctrine as a basis for finding aggravating factor nine. Aggravating factor nine requires a determination of whether there is a need to deter defendant from violating the law, N.J.S.A. 2C:44-1(a)(9), not from deterring an individual from adhering to a nonsensical and baseless set of beliefs about our laws and legal system. We do not, however, find the court's brief reference of the need to deter acceptance of the sovereign citizen doctrine requires reversal of defendant's sentence because defendant's extensive and significant prior record, and his course of conduct in committing the very serious offenses for which he was convicted, otherwise provide ample support for the court's finding of aggravating factor nine.

Defendant also claims the court erred by imposing maximum consecutive sentences on three of the offenses for which he was convicted, and by failing to

consider the overall length of the aggregate sentence. We first observe the court conducted a thoughtful and detailed review of the Yarbough factors in determining whether to impose the consecutive sentences, see Yarbough, 100 N.J. at 643-44, and the record supports the court's findings. The crimes were separate and distinct from each other, committed at different times and locations, and involved separate victims. Ibid. The robbery and the carjackings also involved separate threats of violence. Ibid.

Our Supreme Court has cautioned "against the imposition of multiple consecutive maximum sentences unless circumstances justifying such an extraordinary overall sentence are fully explicated on the record." State v. Randolph, 210 N.J. 330, 354 (2012). "The focus should be on the fairness of the overall sentence, and the sentencing court should set forth in detail its reasons for concluding that a particular sentence is warranted." State v. Miller, 108 N.J. 112, 122 (1987).

As noted, the court conducted a well-supported and reasoned analysis of the Yarbough factors supporting its imposition of consecutive sentences. The court also separately explained its reasons for imposing maximum sentences for defendant's convictions for the receiving stolen property charge to which he pleaded and the first-degree robbery and March 24, 2014 carjacking for which

he was convicted at trial. The court further explained the reason it imposed the minimum sentence on defendant for his participation in the March 27, 2014 carjacking—the primary role in that carjacking was played by McClain.

Beyond explaining its decision to impose the maximum sentences for the three offenses and separately explaining its decision to make the four sentences consecutive, the court did not satisfy our Supreme Court's requirement in Randolph. The sentencing court did not explicate the reasons supporting its imposition of three consecutive maximum sentences totaling fifty-five years, and the court made no findings addressing the overall length of the sentence imposed. Randolph, 210 N.J. at 354.

We therefore vacate defendant's sentence and remand for resentencing. In doing so, we offer no opinion on the length of the sentence imposed and our opinion should not be read to the contrary. That decision is left to the sound discretion of the sentencing court.

Defendant's convictions are affirmed. We vacate his sentence and remand for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

43