849 A.2d 1105 (2004)
369 N.J. Super. 532
STATE of New Jersey, Plaintiff-Respondent,
v.
M.J.K., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued December 15, 2003.
Decided June 9, 2004.
*1106 John R. Klotz, Rutherford, argued the cause for appellant.
Steven E. Braun, Chief Assistant Prosecutor, argued the cause for respondent (James F. Avigliano, Passaic County Prosecutor, attorney; Mr. Braun, of counsel and on the brief).
Before Judges HAVEY, NEWMAN and HOENS.
The opinion of the court was delivered by HOENS, J.A.D.
Defendant M.J.K. was charged in Passaic County Indictment No. 98-03-0329-I with second-degree attempted aggravated sexual assault, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:14-2a(4); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4d; third-degree aggravated assault, N.J.S.A. 2C:12-1b(2); and third-degree criminal restraint, N.J.S.A. 2C:13-2a. A superceding indictment, No. 98-11-1031-I, added a charge of first-degree kidnapping, N.J.S.A. 2C:13-1b(1) and N.J.S.A. 2C:13-1b(2).
In pre-trial proceedings, certain statements defendant made to police investigators were suppressed. The judge determined, following a hearing, that because of defendant's neurological impairment and significant deficiencies in ability to understand verbal and written material, the State had not met its burden of demonstrating that he had the cognitive ability to knowingly and intelligently waive his Miranda[1] rights. At the same time, other statements defendant made and evidence found in a vehicle searched based on defendant's consent were deemed admissible because the judge determined that the statements were made voluntarily and that the discovery of the evidence would have been inevitable.
*1107 After extensive pre-trial hearings, the judge issued a written opinion finding defendant competent to stand trial. Following a jury trial thereafter, defendant was found guilty of third-degree criminal restraint, N.J.S.A. 2C:13-2a, and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4d. He was acquitted by the jury of all of the other charges. His post-trial motion for acquittal on the weapon possession charge was denied.
Thereafter, defendant was sentenced on the third-degree possession of a weapon for an unlawful purpose charge to a term of five years probation with 364 days to be served in the county jail, conditioned upon no contact with the victim or her family. In addition, defendant was ordered to undergo psychological or psychiatric counseling, to participate in vocational training and to reside with his father pending further order of the court upon his release from jail. He was also sentenced to the same term and the same conditions on the third-degree criminal restraint charge, to be served concurrently. The sentence was thereafter stayed pending disposition of this appeal.
On appeal, defendant raises the following points.
POINT I
THE TRIAL COURT ERRED IN RULING THAT THE DEFENDANT WAS COMPETENT TO STAND TRIAL.
POINT II
THE TRIAL COURT ERRED IN RULING THAT THE ITEMS SEIZED FROM DEFENDANT'S VEHICLE WERE ADMISSIBLE UNDER THE INEVITABLE DISCOVERY RULE.
POINT III
THE TRIAL COURT ERRED IN THE APPLICATION OF AGGRAVATING AND MITIGATING FACTORS AT SENTENCING.
POINT IV
THE TRIAL COURT ERRED IN RULING THAT THE STATE COULD CROSS-EXAMINE THE DEFENDANT'S EXPERT PSYCHOLOGIST, IF CALLED AS A WITNESS, REGARDING AFFIRMATIVE DEFENSES NOT INTRODUCED BY THE DEFENDANT.
POINT V
[THE TRIAL COURT] ERRED IN DENYING DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL FOR POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE INASMUCH AS DEFENDANT WAS FOUND NOT GUILTY OF THE CRIMES CHARGED AS THE UNLAWFUL PURPOSE.
Because we find merit in defendant's arguments concerning the judge's finding that he was competent to stand trial and because we reverse based on our analysis of that argument, we need not address the other arguments included in defendant's appeal. We turn then to our consideration of the issues relating to defendant's competence.
The facts that gave rise to defendant's arrest and indictment, as presented by the State, may be summarized as follows. On January 6, 1998, S.R., who was a student at Lakeland Regional High School, was leaving school after participating in a fencing meet. At some time between 6:15 p.m. and 6:30 p.m., S.R. was outside of the school, standing between the so-called new and old school buildings. She was waiting for her father to arrive, having telephoned him for a ride home. She saw defendant, a former student, who was also outside of the school, and who was pacing back and *1108 forth. At the time, she knew who defendant was although she did not personally know him. As she was standing facing the street, he approached her from behind, put one hand on her mouth and held a knife to her throat.
S.R. asked defendant what he wanted, to which he responded "Just start walking, you'll know soon enough." He then pushed her toward a dark alcove, a distance later measured to be approximately three hundred and seventy-four feet. S.R. believed that if she crouched down she might be able to get away from him, so she intentionally fell to the ground, with the result that defendant tripped and fell on top of her. The two struggled on the ground, as S.R. called for help and began to kick defendant in the groin. During the struggle, she noticed that defendant was wearing thick glasses which she grabbed off of his face, prompting him to tell her not to hurt his glasses. As the struggle continued, S.R. saw her father's car and called to him for help, which startled defendant, who then released her, at which point she kicked him in the face and ran away.
S.R. then told her father that defendant had tried to rape her and she used her father's cell phone to call the police. Her father, B.R., saw defendant, who was still near the alcove and who was holding a knife with a red handle. B.R. and another adult who had arrived then began to chase defendant. A short time later, aided by one of the teachers who was at the school for a basketball game, they found defendant in the parking lot. The teacher recognized defendant as a former student. When the teacher asked him why he had dirt and leaves on his clothes, defendant said that he had been wrestling with a girl. The teacher, noticing that defendant had an object in his hand, asked him what it was and asked defendant to give it to him. Defendant complied and gave the teacher a Swiss Army knife.
The question of defendant's competence to stand trial was extensively studied, with four different experts offering opinions on the subject. For purposes of this opinion, we first note that much of the factual background concerning defendant and relevant to his competence was revealed in his school records and is undisputed. We therefore summarize that background evidence as follows. Defendant was first referred for an evaluation in 1983 when he entered kindergarten. That evaluation revealed that defendant suffered from a significant delay in acquisition of language skills, perseverative behaviors and difficulty in gross and fine motor skills. As a result, he was classified for educational purposes as neurologically impaired, a classification later changed to perceptually impaired. At about the same time, he was diagnosed as suffering from minimal brain dysfunction. Defendant was placed in special education classes and continued to be so classified throughout his years in school.
Over the years, his school records indicate that he was found to have difficulty processing information. At age twelve, he was tested and found to have an IQ in the Borderline range. At age fifteen, as a part of a re-evaluation in connection with his educational placement, he was found to "be at a severe disadvantage when he attempts to master any higher level academic task ... the implication of these data is that [M.J.K.] will likely have difficulties relating to same-age peers because his understanding of the complexities of their social interactions will be deficient." Another report issued in connection with that re-evaluation described his "considerable deficits in receptive and expressive language functioning" and noted that his "awareness and understanding of figurative *1109 language is virtually non-existent and exacerbates his pragmatic difficulties."
M.J.K. remained in special education classes through high school and completed the requirements for graduation from high school that were included in his Individualized Educational Plan (IEP). He was awarded a high school diploma which the judge aptly described in his written opinion respecting defendant's inability to knowingly and voluntarily waive his Miranda rights as "geared to his specific ability and not that of any State standard." M.J.K. then attempted to continue his education through a county community college. He failed, however, to perform with sufficient proficiency on the placement examination to be admitted even to remedial college-level courses in English. He only achieved a minimal score for admission into remedial classes in math.
Other information relating to defendant and his general level of functioning had been disclosed in pretrial proceedings. For example, one of the conditions of defendant's release on bail was a requirement that he be supervised at all times by one of a list of approved supervisors, who were required to ensure that he report in person and by telephone for bail supervision. As a practical matter, the obligation to supervise or accompany M.J.K. at all times fell upon his father, who ensured that M.J.K. was present at all court proceedings and who accompanied him to the appointments with the forensic examiners. In addition, although he was prohibited from reporting to his job as a further condition of his bail, the record reflects that M.J.K. had been employed following his graduation from high school at a variety of menial jobs. His last employment prior to the events in issue was as a cart boy or bagger at a grocery store where he had worked a few hours each week.
Prior to trial, the judge conducted a hearing to determine defendant's competence, during which four experts offered their opinions. The first witness was Christine Joseph, Ph.D., a clinical psychologist who testified on behalf of the State. First licensed as a psychologist in 1993, she has been employed at the Anne Klein Forensic Center since 1999. She received her training concerning competency determinations from a licensed psychologist at the Anne Klein Center.
Joseph met with defendant to assess his competence in January 2001. She was surprised, based on the background material she had read about him, that her interview with him took only one-and-ahalf hours. After reading that material, she had expected defendant to have difficulty answering questions, but found that he did not. In the interview, defendant reported information which was consistent with the background material. He understood the purpose of their meeting, and was oriented to time, place, and person.
Joseph learned that defendant had been in special education classes in school and that he had been classified as perceptually impaired. He told her that in high school, he had been the manager of the basketball, volleyball and softball teams. He also told her that he worked three to five hours each day at a supermarket, although she did not ask about his specific job assignment. Joseph was impressed with defendant's language skills.
Joseph testified that she was not convinced that defendant met the criteria for mental retardation, as there was no evidence that he had been classified as mentally retarded. Instead, she diagnosed him with borderline intellectual functioning related to his learning disability, which she testified is not the same as mild mental retardation.
Nevertheless, she administered the Competence Assessment for Standing Trial for Defendants with Mental Retardation *1110 (CAST-MR), which is a test designed to aid in determining whether a mentally retarded person is competent to stand trial. She did so because the records she reviewed included information that defendant's IQ was 73, which made it appropriate to administer the CAST-MR.
During the hearing, Joseph explained the CAST-MR test. The first part is a multiple choice test for familiarity with basic legal terminology. When Joseph administered the test, defendant scored 100% on that section. In the second part of the test, the subject is asked questions requiring that he make reasonable choices in order to determine whether the person has the skills needed to assist in his own defense. When Joseph administered the test, defendant scored 80% on that section. In the third part of the test, the subject is asked about the specific charges against him. Joseph testified that defendant's answers indicated that he understood the charges against him and she awarded him a score of 95% on that part of the test. Defendant's overall score was 93%, the highest score Joseph had ever had any subject achieve on the test. Joseph opined that there was "very little doubt in my mind that he is competent to stand trial." She further noted that if she had had any doubts about defendant's competence, she had the authority to hospitalize him for thirty days in order to make an accurate assessment, a step she considered to be unnecessary in defendant's case.
On cross-examination, Joseph was challenged about her familiarity with the CAST-MR test, the adequacy of her training to administer it, the level of her experience with the use of the test for mentally retarded individuals and the manner in which she administered the test to defendant. She contended that she was qualified to administer the CAST-MR test according to its accompanying manual. She acknowledged that when she first started administering the CAST-MR, she had no specialized training in or experience with mental retardation and that she had received all of her training in the use of that test from others on the staff at the Anne Klein Center. She testified that she had administered the test for competence more than 200 times, including between ten and twelve times specifically involving mentally retarded individuals. She denied using inappropriate methods, she specifically denied using leading questions and she defended the way in which she had scored defendant's performance on the test.
Three other experts were called to testify, all on behalf of defendant. The first, Dr. Paul Dasher, a licensed psychologist since 1990, had initially evaluated defendant at the request of the court. Dasher testified that based on defendant's relatively sophisticated vocabulary, he thought at first that defendant was competent. Eventually, however, he concluded that defendant was not. Dasher interviewed defendant twice and administered the WAIS-R, which is more commonly known as the IQ test. Dasher found that defendant's full-scale IQ was 73, an indication of mild mental retardation. Dasher also administered the Projective Drawings test, which showed that defendant had "underlying neurological impairment in conjunction with major indicators of impulsivity." Dasher did not administer the CAST-MR because he was not familiar with it.
Dasher testified that because defendant has a good memory, he gives the impression that his cognitive functions are higher than they actually are. He also found that defendant's ability "to abstract" was poor. Based on his interviews, testing and evaluation, Dasher opined that defendant did not have the capacity to relate to defense counsel sufficiently to assist in his own defense or to help plan legal strategy. As examples, Dasher noted that defendant *1111 could not understand a plea agreement, had no ability to weigh and consider various rights including his right not to testify, and that he did not understand the concept of a defense. Based upon the results of his testing and based upon the interviews he conducted, Dasher determined that defendant was not competent to stand trial and that he would never achieve a level of intellectual functioning that would allow him to adequately assist in his own defense.
Dr. Mark Siegert, who has held a doctorate in clinical psychology since 1984, testified thereafter. His background included five years as a clinical instructor in psychology and psychological testing and assessment at Harvard Medical School, service as the Supervisor of Psychological Testing and Psychotherapy at Columbia University, where he taught graduate students, and experience as the Chief of the Division of Psychology for St. Barnabas Hospital in Livingston, during which time he also served on the staff at Mountainside Hospital. In addition, he spent a year working at a rehabilitation center for multiply-handicapped children, who suffered from mental retardation along with one or more other handicaps.
Siegert interviewed both defendant and his father. He found that on the surface, the depth of defendant's disability was not apparent. Siegert opined that while defendant was oriented to time, place and things and thus met the criteria for proceeding to trial under the first prong of the competency statute, he did not meet the criteria established in the second part of the statute for a finding of competence. According to Siegert, defendant did not have the ability to understand and weigh the decision about whether or not to testify, did not understand the consequences of his answers and had no capacity to understand plea negotiations. Defendant therefore did not have the ability to participate in an adequate presentation of a defense and lacked the ability to understand specific defenses. Although defendant could sometimes identify witnesses who were favorable or unfavorable to him, he could not do so consistently. Moreover, defendant lacked the ability to abstract and generalize. Siegert also found that defendant had a full-scale IQ of 73, a score that indicates that defendant has mild mental retardation in accordance with the DSM-IV, the diagnostic manual used by mental health professionals.
Siegert also offered opinions about Dr. Joseph, the State's expert. He opined that Joseph was not qualified to administer the CAST-MR because the test protocol requires that it be given by those who have specific experience working with people with mental retardation, a qualification Joseph lacked. Moreover, Siegert opined that this shortcoming on Joseph's part had the capacity to affect the administration of the test and thus the validity of the results. As an example, Siegert noted that, based upon the raw data that Joseph supplied, she had used a leading question and guided defendant to an answer, but had then scored the answer as if defendant had spontaneously given it correctly. In addition, he found that Joseph improperly gave defendant more information to help him answer questions, but then gave him full credit as if he had answered correctly without assistance. Further, he found that Joseph also gave defendant full credit for incomplete answers rather than scoring those responses as partially correct answers.
Siegert also testified that after he read Joseph's report and reviewed the test methodology that led to her conclusion that defendant was competent, he contacted Dr. Caroline Everington, one of the originators of the CAST-MR. He asked Everington to evaluate defendant, because *1112 he was concerned that Joseph had not done so properly. According to Siegert, Everington is not only the "foremost authority of competency and mental retardation," but a "very brilliant forensic psychologist and quite a scholar," who had "impeccable credentials" as well. Siegert did not administer the CAST-MR to defendant himself because he had never given it.
Dr. Caroline Everington did thereafter evaluate defendant and she also testified on his behalf. She earned her Ph.D. in special education and worked with mentally retarded people for twenty-five years. At the time of trial, she was a professor and Associate Dean at Richard Riley College of Education, Winthrop University, South Carolina. She authored over twenty articles on mental retardation and its relationship to one's competence to stand trial which had been published in professional psychological journals. She received numerous grants and fellowships to pursue research in the subject and has made numerous presentations on the topic over the years. Everington also wrote a Guide for Psychologists, which is used by psychologists in assessing mental retardation.
Everington was the co-originator of the CAST-MR test. Prior to developing the CAST-MR, Everington had developed five versions of an educational assessment test for mentally retarded persons used in New Mexico. In addition, even before developing the CAST-MR, Everington had an extensive background in testing, including validation and construction methodologies.
Everington testified that the co-author of CAST-MR was Ruth Luckasson, a professor of special education and an attorney. Everington considered her co-author to be a "leader" in the field of mental retardation, who served on the President's Committee for Mental Retardation and who was the lead author of the definition for mental retardation adopted by the American Association for the Mentally Retarded (AAMR) which has come to be called the "Luckasson Definition" and which is also used in the DSM and by the World Health Organization.
Everington explained that the CAST-MR is a test used to assist an evaluator in determining whether a defendant with mental retardation is competent to stand trial. It indicates what a defendant knows relative to the standard for competence to stand trial. The test manual sets forth the qualifications of those eligible to give the test. One of the criteria required for the individual administering the test is previous experience or training in the area of mental retardation. Everington testified that this qualification is important because persons with mental retardation frequently master testing ability so it may be difficult to detect a disability unless one is an experienced examiner. The kind of questioning used by an examiner is also important because mentally retarded people display acquiescence and a very strong desire to please. They are likely to answer "yes" and are easily led because they do not want to admit to the examiner that they do not understand. According to Everington, if a person without experience in dealing with this population allows suggestibility into the testing process, "you may not get an accurate assessment of the person's understanding."
Everington determined that it was appropriate to give the CAST-MR test to defendant because he met the definition for mental retardation under both the AAMR and the DSM-IV standards. Specifically, defendant has substantial limitations in his present functioning as evidenced by his IQ of 73, his cognitive deficiencies and his language problems. Furthermore, while a diagnosis of mental retardation requires demonstration of deficits in two out of a possible ten *1113 adaptive skills areas, defendant showed deficits in seven of those areas, including home living, community use, self care, work skills, self direction, social skills and communication.
To make the adaptive skills determination, Everington administered several tests, including the TOAL-3 (Test of Adolescent and Adult Language). Defendant scored below the first percentile in all areas except one, which was listening, in which he scored in the third percentile. His overall score was also below the first percentile when compared with others of his age. The TOAL-3 test therefore showed that defendant had significant problems in processing what was said to him as well as in expressing what he knew.
After determining that defendant was mentally retarded and therefore deciding that it was appropriate to do so, Everington administered the CAST-MR test to defendant. On the first part of the CAST-MR test, defendant scored 92%, which showed that he had a good understanding of the terminology required to participate in a legal proceeding. On the second section, which tests skills needed to assist in a defense, however, he scored only 53%. On the third section, which tests the individual's understanding of case events, defendant scored only 60%. Based on Everington's testing, therefore, defendant scored below the established cut-off level for competence in both the second and third sections of the CAST-MR test.[2]
In addition to her testing of defendant, Everington interviewed defendant for six-and-one-half hours. She also interviewed defendant's father for two hours and defendant's special education teacher for one hour. Everington also reviewed documents relevant to defendant and to the case. After considering all of this evidence, Everington determined that defendant was not competent to stand trial. In her opinion, defendant did not have adequate comprehension, and thus did not satisfy three of the statutory criteria for competence. She concluded that he was unable to assist in his own defense because he could not communicate important information or relate events to his attorney, could not understand abstract information, and could not make decisions. She further concluded that he did not have an adequate understanding of entering a guilty plea and thus could not engage in meaningful plea negotiations. Everington opined that defendant appeared to be higher-functioning than he is because he has some good vocabulary skills, but that he often only "parrots" what he hears around him.
In addition, Everington reviewed the CAST-MR test that had been administered by Joseph, and opined that it was likely that Joseph had used a leading question with defendant. She also evaluated Joseph's scoring of the test and found it to be inaccurate, resulting in a higher score than should have been awarded. Specifically, she noted that Joseph gave one point credit for answers where only one-half point should have been given. Everington found that in no instance did Joseph score an answer lower than it should have been.
Following the hearing, the trial judge issued his written opinion in which he concluded that defendant was competent to stand trial. In part, he relied on facts in the record including defendant's graduation from high school, ability to read and write, success in receiving a driver's license, part-time employment and attendance at all court proceedings. Respecting *1114 the experts who had testified, the judge wrote:
I also place great weight on Dr. Joseph's evaluation because of her experience in dealing with competency evaluations for the State of New Jersey.... All except Dr. Everington agree that [defendant] will be expected to tell to the best of his ability the facts surrounding him at the time and place where the alleged violation was committed. I disagree with Dr. Everington's findings. Defendant gave the police a factually explicit description of the incident.
...
I am satisfied that defendant understands his right not to testify, he could participate in plea negotiations and has the ability to participate in an adequate presentation of his defense. I am also satisfied that he can communicate with his attorney and has the ability to comprehend his advice. After evaluating defendant's capabilities and his attorney's role in assisting, I have no doubt that the State has established by a preponderance of the evidence that defendant is competent to stand trial.
The test for competence to stand trial arises from our basic concepts of due process. As the United States Supreme Court has held, a defendant tried or convicted while incompetent to stand trial has been deprived of his due process right to a fair trial. See Pate v. Robinson, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815, 818 (1966); State v. Cecil, 260 N.J.Super. 475, 480, 616 A.2d 1336 (App.Div.1992), certif. denied, 133 N.J. 431, 627 A.2d 1138 (1993). Consequently, a court must hold a competency hearing where the evidence raises a bona fide doubt as to a defendant's competence. See Pate v. Robinson, supra, 383 U.S. at 385, 86 S.Ct. at 842, 15 L.Ed.2d at 822; State v. Cecil, supra, 260 N.J.Super. at 480, 616 A.2d 1336. We have previously held that the State bears the burden of establishing competence by a preponderance of the evidence. State v. Lambert, 275 N.J.Super. 125, 129, 645 A.2d 1189 (App.Div.1994).
The minimum requirements for determining whether a defendant is competent to stand trial were first established by the United States Supreme Court in Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825 (1960). There, the Court defined the test as follows: "whether [defendant] had sufficient present ability to consult with his lawyer with a reasonable degree of rational understandingand whether he has a rational as well as factual understanding of the proceedings against him." Ibid. In New Jersey, the test for competence to stand trial on criminal charges has been codified in N.J.S.A. 2C:4-4, which provides:
a. No person who lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as such incapacity endures.
b. A person shall be considered mentally competent to stand trial on criminal charges if the proofs shall establish:
(1) That the defendant has the mental capacity to appreciate his presence in relation to time, place and things; and
(2) That his elementary mental processes are such that he comprehends:
(a) That he is in a court of justice charged with a criminal offense;
(b) That there is a judge on the bench;
(c) That there is a prosecutor present who will try to convict him of a criminal charge;
(d) That he has a lawyer who will undertake to defend him against that charge;
(e) That he will be expected to tell to the best of his mental ability the facts *1115 surrounding him at the time and place where the alleged violation was committed if he chooses to testify and understands the right not to testify;
(f) That there is or may be a jury present to pass upon evidence adduced as to guilt or innocence of such charge or, that if he should choose to enter into plea negotiations or to plead guilty, that he comprehend the consequences of a guilty plea and that he be able to knowingly, intelligently, and voluntarily waive those rights which are waived upon such entry of a guilty plea; and
(g) That he has the ability to participate in an adequate presentation of his defense.
[N.J.S.A. 2C:4-4.]
As we have recently noted, this statute, effective in 1979, replaced the "generalizations of prior case law with more precise and detailed standards for determining a defendant's competency...." State v. Moya, 329 N.J.Super. 499, 506, 748 A.2d 604 (App.Div.), certif. denied, 165 N.J. 529, 760 A.2d 783 (2000); see State v. Khan, 175 N.J.Super. 72, 82-83, 417 A.2d 585 (App.Div.1980).
We have previously described our role in reviewing the decisions of a trial judge respecting competence as "typically, and properly, highly deferential." State v. Moya, supra, 329 N.J.Super. at 506, 748 A.2d 604. Moreover, we have recognized that the decision regarding competence is for the judge and not for the experts to make. Ibid. Bearing that general guidance in mind, however, our review of this record compels us to conclude that the judge's evaluation of the evidence and the testimony of the experts was fundamentally flawed and that his conclusion that this defendant was competent to stand trial cannot be sustained.
We note first the role we ascribe to experts and to their opinions. "Expert testimony is needed where the factfinder would not be expected to have sufficient knowledge or experience and would have to speculate without the aid of expert testimony." Torres v. Schripps, Inc., 342 N.J.Super. 419, 430, 776 A.2d 915 (App. Div.2001). Expert testimony, however, "need not be given greater weight than other evidence nor more weight than it would otherwise deserve in light of common sense and experience." Ibid. (citing In re Yaccarino, 117 N.J. 175, 196, 564 A.2d 1184 (1989)). Indeed, a judge is not obligated to accept an expert's opinion, even if the expert was "impressive." State v. Carpenter, 268 N.J.Super. 378, 383, 633 A.2d 1005 (App.Div.1993), certif. denied, 135 N.J. 467, 640 A.2d 848 (1994). The factfinder may therefore accept some of the expert's testimony and reject the rest, Todd v. Sheridan, 268 N.J.Super. 387, 401, 633 A.2d 1009 (App.Div.1993), and may do so even if that testimony is unrebutted by any other evidence. Johnson v. American Homestead Mortgage Corp., 306 N.J.Super. 429, 438, 703 A.2d 984 (App.Div.1997). Respecting expert opinions of psychiatrists or psychologists, the court, sitting as a factfinder, must use its "common sense and ordinary experience." In re Yaccarino, supra, 117 N.J. at 196, 564 A.2d 1184. This is particularly true when, as here, the factfinder is confronted with directly divergent opinions expressed by the experts.
While the judge, therefore, was empowered to accept or reject from among the various opinions and was permitted to evaluate those opinions in light of all of the evidence in the record, the grounds he articulated for his choice here demonstrate an obviously mistaken exercise of discretion. We reach this conclusion for several reasons.
First, while placing "great weight" on Joseph's opinion because of "her experience in dealing with competency evaluations for the State," the judge overlooked the fact that her experience in evaluating *1116 mentally retarded individuals like defendant was minimal. He evidenced, as well, no awareness of the fact that her familiarity with the diagnostic criteria for mental retardation was also limited. He overlooked the fact that she lacked the credentials which would have made her qualified to administer the CAST-MR test. Most telling, we think, is the fact that Joseph's very lack of experience with this population led her to make precisely the error that the test's originator warned of, namely, perceiving relatively strong language skills, coupled with a good memory and an eagerness to please, to be evidence of far greater mental capacity than defendant actually has.
Beyond that, the judge overlooked Joseph's improper administration of the CAST-MR test evidenced by her use of at least one leading question, her assistance to defendant to increase his score and her inappropriate scoring, all of which made her opinion suspect. In addition, Joseph's abbreviated personal interview, her failure to inquire about the nature of defendant's employment and her apparent lack of familiarity with the high school graduation criteria utilized for students in special education programs plainly caused her to overstate the few achievements defendant had managed to make in the real world. It is axiomatic that an expert's opinion is only as strong as the facts on which it rests. See Higgins v. Owens-Corning Fiberglas Corp., 282 N.J.Super. 600, 614, 660 A.2d 1252 (App.Div.1995); State v. Freeman, 223 N.J.Super. 92, 115-16, 538 A.2d 371 (App.Div.1988), certif. denied, 114 N.J. 525, 555 A.2d 637 (1989); Polyard v. Terry, 160 N.J.Super. 497, 511, 390 A.2d 653 (App.Div.1978), aff'd, 79 N.J. 547, 401 A.2d 532 (1979). Judged against this standard, Joseph's opinion was built on an inadequate factual foundation.
Second, while the judge was free to reject the opinions of the other three experts, he gave no reason for doing so except for his observation that he disagreed with Dr. Everington's findings. Objectively analyzed, the dispute among the experts focused not on defendant's ability to accurately relate facts, but upon his ability to understand and participate in his own defense. It was in these aspects of the experts' analyses that the divergence of opinions most clearly exposed the flaws in Joseph's methodology. Properly tested, defendant fell below the established cut-off of the CAST-MR test for competence both in terms of skills needed to assist in his defense and in his understanding of the events of his case. The opinion of the originator of that test both as to defendant's competence and as to the flaws in Joseph's methodology and opinion should not have been so lightly rejected.
Third, while the judge was entitled to rely on one opinion out of the four, his failure to give any reasons for rejecting the opinions of Dr. Siegert and Dr. Dasher was inappropriate. Each of them conducted a careful and thoughtful analysis of defendant's abilities to understand and participate in his defense. Each of them, when compared with Dr. Joseph, was eminently better qualified to evaluate a mentally retarded individual like defendant. Their contrary opinions, if they were to be rejected, were entitled to the judge's careful analysis and consideration and were deserving of an explanation of the judge's reasons for his apparent disagreement with their conclusions.
We do not intend to imply that the judge should have simply counted the experts on each side of the issue in some sort of a "majority rules" analysis. Nor do we intend to imply that Dr. Joseph is not, in general, qualified to determine competence to stand trial. We do conclude, however, that given the particular deficits of this defendant, her ability to accurately evaluate *1117 his competence, when compared with the experience and credentials of the other three experts, was lacking.
Fourth, even the real world evidence in the record which the judge mentioned in order to bolster his conclusion on defendant's competence was vastly overstated. In truth, defendant can read at about a fourth or fifth grade level. His high school diploma, awarded based on his IEP criteria, does not in any sense equate with a normal high school education. The proof of that, of course, is the fact that when he tried to continue his education, he did not even qualify for non-credit remedial classes at the community college. His IQ tests reveal that he is mentally retarded. His only employment has been at menial part-time jobs, most recently as a cart boy or bagger at the grocery store. His ability to attend court and to arrive on time is merely a testament to his father's supervision of him.
None of these facts bespeak sufficient competence to appreciate the significance of or to exercise the right to testify or remain silent. N.J.S.A. 2C:4-4b(2)(e). None of them demonstrates a comprehension of the consequences of a guilty plea, of the wisdom of entering into negotiations for a plea or of the advisability of accepting a plea offer. N.J.S.A. 2C:4-4b(2)(f). None of them suggests even a minimal ability to participate in "an adequate presentation of his defense." N.J.S.A. 2C:4-4b(2)(g).
The record is abundantly clear that defendant M.J.K. was not competent to stand trial. We therefore reverse the order of April 8, 2002, finding defendant competent, and we vacate the judgment of conviction and sentence dated February 6, 2003.
Reversed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] As Everington explained, part two of the test consists of fifteen questions, for which a raw score of ten is required, and part three of the test consists of ten questions, for which a raw score of seven is needed.