# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0877-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.A.,

      Defendant-Appellant,

and

S.M., J.B., and A.W.,

      Defendants,

_____

IN THE MATTER OF S.J.B.,
J.A. and N.A., minors.

_____

Argued September 29, 2021 – Decided October 26, 2021

Before Judges Whipple, Geiger and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0201-18.

Deric Wu, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Deric Wu, of counsel and on the briefs).

Mary L. Harpster, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Mary L. Harpster, on the brief).

Nancy P. Fratz, Assistant Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Nancy P. Fratz, of counsel and on the brief).

PER CURIAM

Defendant J.A. (Jared)[1] appeals from a Family Part's June 25, 2018 order finding that he abused and neglected S.J.B. (Sarah) within the meaning of N.J.S.A. 9:6-8.21(c)(1) and (4)(b), and a September 13, 2019 order terminating the litigation. We affirm.

---

[1] We use initials and pseudonyms to protect the privacy of the children and parties and to preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

A-0877-19

S.M. (Sylvia) is the biological mother of Sarah, who was born on April 18, 2013, and J.A. (Joseph), who was born on August 6, 2017. J.B. (Jack) is Sarah's father, and Jared is Joseph's father. A.W. (Anita) is Jared's mother, and Joseph's paternal grandmother. At the time of the incident, Jared was Sylvia's boyfriend and lived with her, as did Anita.

Judge David B. Katz conducted a fact-finding hearing on five non-consecutive days in June 2018, at which plaintiff Division of Child Protection and Permanency (Division) presented the testimony of Division Investigator Danielle Howell and Gladibel Medina, M.D. The Law Guardian presented the testimony of Steven Kairys, M.D. Jared presented the testimony of Joseph Scheller, M.D. and Jack Levenbrown, M.D. Defendants did not testify at the hearing. The Division did not intend to move Sarah's forensic interview into evidence, Jared offered it in evidence. The parties consented to its admission.

Sarah's hospital records, imaging studies, an ophthalmologist's consult report, the Division's Investigation Summary, and all of the experts' reports and curriculum vitae were admitted into evidence.

Because the finding of abuse and neglect hinges upon the testimony of the witnesses, Sarah's forensic interview, and the reports admitted into evidence, we summarize them.

A-0877-19

<u>Investigator Howell's Testimony and Reports</u>

On November 18, 2017, the Division received a referral of alleged physical abuse of then four-year-old Sarah, who was being transported by ambulance to the hospital with suspected head trauma. The police reported Sarah had been home with her mother's boyfriend, Jared, who stated she hit her head in the bathtub.

That same day, Division Special Protective Response worker Edith Quainoo responded to the hospital but was unable to speak with Sarah, who was in a medically induced coma. Quainoo spoke to Jared at the hospital. Jared indicated that he returned home at about 4:00 p.m. on November 17, at which time Sylvia left for work. Jared fed his two sons and Sarah. Anita arrived home at about 6:00 p.m. and took Jared's two sons into her bedroom. Sarah went into Sylvia and Jared's bedroom to lie down.

According to Jared, Sarah vomited on her pillow and then went into the bathroom because she was nauseous. When she returned to the bedroom, Jared told her to return to the bathroom to clean herself up. Jared said he took some items to Sarah and then returned to the bedroom to lie down. When Sarah returned to the bedroom, she told him she fell in the bathtub and hit her head, but she was neither crying nor complaining of pain. They both fell asleep.

A-0877-19

Jared was later awoken by Sarah screaming. Her arms were stiff, and she was not speaking. Anita entered the bedroom and called for an ambulance. Jared then called Sylvia. Jared told Quainoo he had not heard or seen Sarah fall in the bathtub and he did not know if Sarah suffered any other recent injuries.

Quainoo also interviewed Anita, who stated she woke up at about 9:00 p.m. when Jared entered her bedroom hysterical. Anita went to see Sarah, whose hands were "pulled out" and legs were "frozen." Thinking that Sarah was having a seizure, Anita called 911.

Quainoo then interviewed Sylvia, who spent the previous day at home with her children before leaving for work at 4:00 p.m. When Jared called her at about 8:00 p.m., she could hear Sarah screaming. During a video call set up by Jared, Sarah appeared stiff and nonresponsive. The ambulance was there by the time Sylvia arrived home.

Sylvia indicated Sarah had behaved normally during the past week and she had no concerns about her. Sarah reported that she had been punched in the stomach by two classmates earlier that week but did not complain of any pain.

On November 20, 2017, Investigator Howell went to the hospital, but Sarah was still in a coma. She observed bruising on Sarah's knee, arm, and

behind Sarah's ear, a healing burn on Sarah's back, and an older burn on her face. A skeletal survey revealed a healing rib fracture.

Howell spoke with Sylvia at the hospital. Sylvia confirmed that Sarah required assistance turning on the bath water, and when Sylvia was not home, Jared turned on the water for Sarah and checked on her during her bath. Sylvia denied that Sarah had ever previously fallen in the bathtub. Sylvia said she had not observed any bruises on Sarah's body, and she had not complained of any pain or injury earlier that week. Sarah also did not report any pain from being punched in the stomach by two classmates. Sylvia also said Sarah had displayed no changes in behavior or unusual demeanor during the past week. Sylvia could not explain Sarah's injuries.

On November 21, 2017, Howell spoke with Jared about the July 17th incident. Jared reiterated that Sarah had spit up on her pillow and went into the bathroom to clean up. Jared stated he saw additional vomit on the bathroom floor and toilet, placed clean clothing for Sarah on the sink, and returned to the bedroom to lie down. He did not otherwise assist or monitor Sarah. Jared claimed that when Sarah exited the bathroom, she told him she had fallen and hit her head but felt fine. She then fell asleep. Jared said he was awakened by Sarah screaming.

A-0877-19

Jared told Howell that he typically left Sarah alone in the bathroom when bathing. Jared could not explain how Sarah sustained her new injuries but claimed she was clumsy and often fell and hurt herself. He confirmed that he and Sylvia were Sarah's primary caretakers.

On November 28, 2017, Howell met with Sarah's teacher, who denied Sarah was clumsy. The teacher stated that Sarah had not complained of any pain from being punched in the stomach.

By December 4, 2017, Sarah was removed from the respirator and was interviewed three days later. Sarah said her mother told her that she was in the hospital because she fell but Sarah did not remember falling. Sarah reported that Jared hit her on the shoulder and leg, shook her with both hands, and told her: "Stop talking, no talking, go to bed." Sarah was unable to demonstrate how Jared had shaken her because she was unable to use her injured left arm.

Sarah underwent a forensic interview the next day. Sarah reported that Anita told her what to say about the incident.

Dr. Medina's Report and Testimony

Without objection, Dr. Medina, who is Board-certified in pediatrics and child abuse pediatrics, was qualified as an expert in those fields. He reviewed

7

Sarah's medical records and issued a report diagnosing her with abusive head trauma, abdominal trauma, and physical child abuse.

To render a diagnosis of abusive head trauma, Dr. Medina reviewed the child's medical findings and prior history, caretaker statements about the incident, and the timing of any neurological symptoms. Sarah exhibited neurological symptoms of brain tissue injury. Dr. Medina found no other historical or medical explanation for Sarah's traumatic brain injury and diagnosed abusive head trauma.

A CT scan of Sarah's head performed immediately after her arrival at the hospital showed new subdural bleeding on the left and right sides of Sarah's head. It was caused by Sarah's brain moving within her head. The CT scan also revealed blood inside Sarah's brain in areas where no blood should be present, which was indicative of injury. The CT scan did not show any soft tissue injuries to Sarah's scalp or a skull fracture.

An MRI of Sarah's head performed two days later showed the region of Sarah's brain that controlled her left side had either been injured or affected by a seizure. Dr. Medina ruled out a seizure because a seizure would not have damaged her motor neurons.

A-0877-19

A Magnetic Resonance Angiogram (MRA) was normal and showed no vascular abnormality that would explain the bleeding in Sarah's brain. Blood studies, including a coagulation profile, were also normal except for elevated liver enzymes detected on admission. Her elevated liver enzymes quickly fell back to normal levels, which supported a finding of trauma as this would not have occurred if caused by disease or infection.

Dr. Medina noted that a physical exam revealed bruising on her thigh that was consistent with Jared hitting her legs. A CT scan of Sarah's abdomen revealed a healing rib fracture and possible spleen abnormality. Radiologists concluded that Sarah's spleen had likely sustained a small laceration. A skeletal study also revealed the rib fracture.

Dr. Medina opined that injury to Sarah's internal organs would cause pain, make her irritable, and could cause vomiting and loss of appetite. Sarah did not exhibit any of these symptoms after being punched by classmates or when Sylvia left for work on November 17th. Consequently, Dr. Medina opined that Sarah sustained the injuries after Sylvia left for work.

An ophthalmologist consultation was ordered. The ophthalmologist's report was admitted into evidence. He found Sarah had multi-layer retinal hemorrhages in the rear and periphery of her eyes. This pattern of the

9

hemorrhages results from vitreoretinal traction caused by sudden acceleration and deceleration of the head with hyperextension and hyperflexion. In children the occurrence of this injury requires repetitive, significant force.

In contrast, large subarachnoid bleeding in adults is known as Terson's syndrome, resulting in vitreous bleeding with a characteristic pattern. The ophthalmologist ruled out Terson's syndrome as a cause and determined the hemorrhage pattern was typical of abusive head trauma.

Dr. Medina opined that a shaking event, involving rapid onset, repetitive hyperextension and hyperflexion, would cause the brain to move inside the skull and strike the sides of the skull, causing contusions like Sarah had sustained.

The same mechanism would cause the axonal injury depicted on the MRI, leading to inflammation or permanent brain injury. Picking a child up and throwing her on a bed could also cause the brain to move within the skull and result in these injuries.

Dr. Medina further opined that if Sarah's injuries had been caused by a fall in the bathtub, she would have immediately shown symptoms and been in pain. She would not have appeared normal or said she was fine. Dr. Medina stated that Jared's description of Sarah after her reported fall was "inconsistent with a severe injury to her head happening in the bathtub." On the other hand,

A-0877-19

Sarah's description of the event—being hit on the shoulder and leg, shaken with two hands, and being told to be quiet and go to sleep—would explain all of her injuries. A finding that her injuries were accidental would require the caretakers to give a plausible explanation, which they had not. Even without Sarah's statements, Dr. Medina would still have diagnosed physical child abuse, based on Sarah's condition and the absence of a plausible explanation from Jared and Sylvia.

Dr. Kairys's Report and Testimony

Without objection, Dr. Kairys, who is Board-certified in pediatrics and child abuse, was qualified as an expert in those fields. He testified that Sarah had bilateral acute subdural bleeding, a brain contusion, and blood deep in the ventricles of her brain. She also had bilateral multi-layered retinal hemorrhages and elevated liver and pancreas enzymes. Sarah also had an old fracture of her ninth rib.

Dr. Kairys opined that accidental causation of those injuries would have required an event equivalent to a motor vehicle accident, a fall out of a second story window, or a fall down a flight of stairs. Sarah's injuries required an impact of significant force or a combination of shaking and impact. This would

11

not necessarily cause external injury but would cause bilateral bleeding in the brain from the brain vibrating back and forth within the skull.

Dr. Kairys further opined that while a short fall in a bathtub could produce a small skull fracture and bleeding just beneath the skull, it would not cause Sarah's injuries because it would not create the necessary vibration of the brain that would result in bleeding on both sides of the brain and deep ventricular bleeding. Dr. Kairys noted that bleeding in the head is extremely painful; the injuries Sarah suffered would have caused her immediate severe pain.

Dr. Kairys opined that Sarah's brain and retinal injuries resulted from the same incident. Her multi-layered retinal hemorrhages that extended to the periphery of the eye were "shaking impact injuries" that occur with child abuse or major accidents. He explained that the back-and-forth motion of the brain with rotation causes shearing, which produces the hemorrhages. Going by the history that Sarah was fine until the evening of November 17 meant that something happened to her that evening.

Sarah's elevated liver and pancreatic enzymes were a sign of inflammation. Because levels fell rapidly after Sarah arrived at the hospital, whatever caused the inflammation probably occurred within twenty-four hours

12

of her arrival. Dr. Kairys opined that a preschool child punching Sarah in the stomach area would not generate enough force to injure the pancreas.

Dr. Kairys noted that the location of Sarah's rib fracture was not commonly associated with a fall and was most likely caused by compression. The fracture would have been painful, so if it happened at school, there should be some history of her reporting it to the teacher.

Based on "the history, the physical exam, the various radiological studies and the laboratory tests," Dr. Kairys concluded that the most plausible explanation for Sarah's injuries was "major inflicted trauma" "and all (save for the rib fracture) occurred the day of hospitalization."

Dr. Scheller's Testimony

Dr. Scheller, was qualified as an expert in pediatrics, radiology, and pediatric radiology. He conceded that he had always been retained as a defense expert.

Dr. Scheller confirmed the CT scan and chest x-ray revealed Sarah's rib fracture "happened weeks to months prior to November 17th" but she did not have a skull fracture. The CT scan and MRI showed swelling on the right side of Sarah's scalp, evidencing trauma to the right scalp. He noted that the CT scan and MRI of Sarah's neck showed no injuries.

13

In his initial report, Dr. Scheller acknowledged that multi-layered retinal hemorrhages were associated with child abuse. In the addendum to his report, he confirmed Sarah had "multiple, multi-layered" retinal hemorrhages. This did not alter his conclusion that Sarah had not suffered eye trauma. He opined that the hemorrhages were a sign of Terson's syndrome. Yet on cross-examination, he acknowledged there were no other medical conditions that Sarah was diagnosed with that could have caused the retinal hemorrhages.

The CT scan further revealed that Sarah had "a small amount of" "fresh" blood in the ventricles of her brain on November 17th. Dr. Scheller also noted a "slight amount of blood at the top right, in between the brain, and inside of the scalp." Her brain otherwise looked "fine."

Dr. Scheller further acknowledged that the bleeding in Sarah's ventricles and between the brain and skull were "synonymous with a traumatic head injury" from either accidental or intentional impact trauma. He agreed that Sarah would have been in distress and "whining" from the injuries she sustained, and she would have informed Jared about it.

Dr. Levenbrown's Testimony

Dr. Levenbrown was qualified as an expert in pediatrics and pediatric radiology. Dr. Levenbrown limited his report to Sarah's abdominal and chest

injuries, which did not address her head injuries. He confirmed Sarah had a non-displaced fracture of her left ninth rib that occurred approximately five days before her hospitalization. Dr. Levenbrown opined that the elevated pancreatic and liver enzymes were due to minor trauma to the liver and pancreas that could have been caused by a fall onto the abdomen or being punched there.

During cross-examination, Dr. Levenbrown acknowledged "there was subdural bleeding" and it was "very, very clear" that retinal hemorrhages "are a marker for shaking" and other trauma "or the presence of blood in the brain from other reasons . . . ."

The Law Guardian's Position

The Law Guardian joined in the Division's argument that the Division proved that Jared and Anita abused and neglected Sarah.

The Judge's Findings and Conclusions

At the conclusion of the hearing, Judge Katz made detailed credibility findings. He found Investigator Howell credible. "She presented as a neutral caring caseworker. She answered all questions, she was not impeached, and she acknowledged certain facts that indicate her balance."

The judge found Dr. Medina "highly credible," noting that "[s]he fully explained her role and . . . medical concepts in clear and understandable terms,"

15

"was careful and deliberative as a witness," and provided detailed explanations of the medical findings. The judge found Dr. Kairys "highly credible" and a "most impressive witness."

Although he found Dr. Scheller "highly credentialed," the judge "had difficulty with some of his testimony." He noted that Dr. Scheller "limited his analysis of this child to traditional shaking." The judge stated Dr. Scheller seemed "almost to minimize the amount of . . . blood" in areas of Sarah's brain "where there should be no blood at all," by describing it as "a teaspoon," a "small amount," or a "little bit of bleeding." The judge noted that the bleeding in Sarah's brain meant she "suffered horribly" and her "left side was impaired for weeks from blood in the brain."

The judge found Dr. Scheller's discussion of the frequency of retinal hemorrhaging during childbirth to be irrelevant. He also found that Dr. Scheller's opinion that Sarah's elevated enzyme were due to self-infliction or a prior school event "made no sense, because the enzyme levels came down almost immediately after the impact," indicating that "the trauma was acute." The judge rejected Dr. Scheller's opinion that Sarah "fell in the tub, hit her head and then her abdomen against a raised portion of the tub . . . ." "In any event, regardless

16 A-0877-19

of how this happened, it's clear, also according to Dr. Scheller, that [Sarah] would have been in extreme pain and whining."

As to Dr. Levenbrown, the judge stated he could not credit his report and found some of his testimony "extremely speculative." During cross-examination, he "gave an opinion without looking at the entirety of the injuries" despite recognizing that it was "important to look at the whole picture."

Regarding the elevated liver and pancreas enzymes levels dropping rapidly, the judge noted Dr. Levenbrown "couldn't answer if it happened recently" or whether the child would have been in pain. Dr. Levenbrown's inability to discuss the effect this would have had on Sarah caused the judge "to question his analysis."

The judge's findings as to how Sarah's injuries occurred, the mechanism of those injuries, and the nature and extent of her injuries, were largely based on the testimony and reports of Investigator Howell, Dr. Medina, and Dr. Scheller, which he found credible and were supported by the imaging studies, test results, investigation results, patient history, and statements. As part of his comprehensive findings, the judge recounted the most significant evidence. We need not repeat it here.

17

The judge emphasized that the location of the bruising, the bleeding on both sides of Sarah's brain, the brain contusion, the blood in the ventricles deep inside the brain, the left side motor decrease, the healing burn, and the multi-layered retinal hemorrhaging to the rear and periphery of the eyes, "demonstrated abusive head trauma in the context of a shaking event, that is an acceleration or a deceleration," according to Dr. Medina. Consistent with this causation opinion, Sarah manifested "loss of consciousness, altered mental status, and vomiting . . . ." As indicated by Dr. Medina, "children do not suffer these symptoms normally without abuse." "A fall in a tub would not cause bilateral and deep brain injury." The judge noted that all the experts agreed that no one would get out of the tub with these injuries and be fine.

As to the abdominal injury, the judge noted it would have been manifested by vomiting and not eating, neither of which occurred leading up to November 17. On the contrary, Sarah "was fine after the schoolyard incident."

The judge found Jared was taking care of Sarah and was her guardian at the time of the incident within the meaning of Title Nine. Jared did not dispute that finding.

Ultimately, Judge Katz found, by a preponderance of the credible evidence, that Jared abused or neglected Sarah under N.J.S.A. 9:6-8.21(c)(1)

18

and (4)(b) and entered a June 25, 2018 order reflecting his findings. A September 13, 2019 order terminated the litigation. This appeal followed.

Jared raises the following points for our consideration:

> I. THE EXPERTS FOR DCPP AND THE LAW GUARDIAN PROVIDED OPINIONS THAT EXTENDED BEYOND THEIR EXPERTISE, LACKED A SCIENTIFIC FOUNDATION, AND CONTRADICTED EACH OTHER.
>
> > A. Dr. Kairys's Conclusions Were Not Grounded in Science, the Record or Even His Own Expertise.
> >
> > B. Dr. Medina's Apparent Expertise was Betrayed by Her Unfamiliarity with [Sarah's] Medical History and Her Selective Use of Medical Evidence.
>
> II. THE COURT'S FAILURE TO RECONCILE THE CONFLICTING OPINIONS OF DR. SCHELLER AND DR. KAIRYS LEAVES UNRESOLVED THE QUESTION OF HOW [SARAH] ACQUIRED HER INJURIES AND WHAT WAS RESPONSIBLE FOR THE INJURIES.

"Abuse and neglect cases 'are fact-sensitive.'" N.J. Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 180 (2015) (quoting N.J. Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 309 (2011)). "The Division bears the burden of proof at a fact-finding hearing and must prove . . . harm . . . by a preponderance of the evidence." N.J. Div. of Youth & Fam. Servs. v. A.L., 213

19

N.J. 1, 22 (2013) (citing N.J.S.A. 9:6-8.46(b)). The Division must sustain that burden "through the admission of 'competent, material and relevant evidence.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). In determining whether a child was abused and neglected, "the trial court must base its decision on the totality of the circumstances." N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011).

To prevail in a Title Nine proceeding, DCPP must show by a preponderance of the competent, material, and relevant evidence that the parent or guardian abused or neglected the affected child. N.J.S.A. 9:6-8.46(b). There must be "proof of actual harm or, in the absence of actual harm," through "competent evidence adequate to establish [the child was] presently in imminent danger of being impaired physically, mentally or emotionally." N.J. Div. of Youth & Family Servs. v. S.I., 437 N.J. Super. 142, 158 (App. Div. 2014) (citation omitted).

Our review of a trial court's finding of abuse or neglect is guided by well-established principles. "[W]e accord substantial deference and defer to the factual findings of the Family Part if they are sustained by 'adequate, substantial, and credible evidence' in the record." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (quoting N.J. Div. of Youth &

Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). We ordinarily accord such deference because of the Family Part's "special jurisdiction and expertise," N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)), and its "opportunity to make first-hand credibility judgments about the witnesses who appear on the stand . . . [and] has a 'feel of the case' that can never be realized by a review of the cold record," N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)).

"Nevertheless, if the trial court's conclusions are 'clearly mistaken or wide of the mark[,]' an appellate court must intervene to ensure the fairness of the proceeding." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 227 (2010) (alteration in original) (quoting E.P., 196 N.J. at 104). We owe no deference to the trial court's legal conclusions, which we review de novo. N.J. Div. of Youth & Fam. Servs. v. A.B., 231 N.J. 354, 369 (2017) (citation omitted).

Applying that limited scope of review, we affirm the trial judge's finding of abuse and neglect, substantially for the sound reasons expressed in Judge Katz's oral opinion. We add the following comments.

Title Nine governs abuse and neglect proceedings. N.J.S.A. 9:6-8.21(c) provides in pertinent part:

"Abused or neglected child" means a child less than 18 years of age whose parent or guardian, as herein defined, (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; . . . (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court . . . .

"Parent or guardian" includes "any person[] who has assumed responsibility for the care, custody, or control of a child or upon whom there is a legal duty for such care." N.J.S.A. 9:6-8.21(a). By any measure, Jared had assumed care and control of Sarah at the time of the incident.

Title Nine's "primary concern is the protection of the children, not the culpability of parental conduct." G.S. v. N.J. Div. of Youth & Family Servs., 157 N.J. 161, 177 (1999) (citing State v. Demarest, 252 N.J. Super. 323, 330

22

(App. Div. 1991)). <u>Accord</u> <u>A.L.</u>, 213 N.J. at 18. "The focus in abuse and neglect matters . . . is on promptly protecting a child who has suffered harm or faces imminent danger." <u>A.L.</u>, 213 N.J. at 18 (citing N.J.S.A. 9:6-8.21(c)(4)).

"[P]revious statements made by the child relating to any allegations of abuse or neglect" are admissible, and not considered hearsay, as long as they are not the sole basis for the court's finding of abuse or neglect. N.J.S.A. 9:6-8.46(a)(4); <u>accord</u> <u>N.J. Div. of Youth & Family Servs. v. P.W.R.</u>, 205 N.J. 17, 33 (2011). A Family Part's determination that evidence is admissible "is reviewed under an abuse of discretion standard. <u>N.J. Div. of Child Prot. & Permanency v. A.D.</u>, 455 N.J. Super. 144, 156 (App. Div. 2018) (quoting <u>N.J. Div. of Youth & Family Servs. v. I.H.C.</u>, 415 N.J. Super. 551, 571 (App. Div. 2010)). Judge Katz admitted Sarah's out-of-court statements, finding them sufficiently corroborated. The record supports that finding. We discern no abuse of discretion.

Proof of injuries sustained by the child that are "of such a nature as would ordinarily not . . . exist except by reason of the acts or omissions of the parent or guardian" is prima facie evidence of abuse or neglect. N.J.S.A. 9:6-8.46(a)(2). The Division proved that the injuries Sarah sustained were not accidental and were caused by Jared.

Jared attacks the testimony of the Division's and Law Guardian's experts. The factfinder is free to "accept some of the expert's testimony and reject the rest." State v. M.J.K., 369 N.J. Super. 532, 549 (App. Div. 2004); see also In re Civ. Commitment of R.F., 217 N.J. 152, 174-77 (2014) (same). Moreover, "a factfinder is not bound to accept the testimony of an expert witness, even if it is unrebutted by any other evidence." Torres v. Scripps, Inc., 342 N.J. Super. 419, 431 (App. Div. 2001) (citing Johnson v. Am. Homestead Mortg. Corp., 306 N.J. Super. 429, 438 (App. Div. 1997)).

The factfinder determines the weight accorded to expert testimony. N.J. Div. of Youth & Family Servs. v. D.M., 414 N.J. Super. 56, 74 (App. Div. 2010). "[T]he weight to which an expert opinion is entitled can rise no higher than the facts and reasoning upon which that opinion is predicated." State v. Jenewicz, 193 N.J. 440, 466 (2008) (quoting Johnson v. Salem Corp., 97 N.J. 78, 91 (1984)). "This is particularly true when, as here, the factfinder is confronted with directly divergent opinions expressed by the experts." M.J.K., 369 N.J. Super. at 549.

Applying our deferential standard of review, we discern no basis to disturb the credibility determinations made by Judge Katz and the weight he accorded to the testimony and reports of the expert witnesses. The judge did not abuse

his discretion in rejecting or giving less weight to the opinions expressed by Jared's experts. The record amply supports Judge Katz's credibility findings and conclusions that flowed from those findings.

Jared contends that Dr. Kairys's theory of causation cannot be reconciled with the evidence. In addition, Jared claims that Dr. Kairys failed to account for Sarah's use of the prescription medicine Griseofulvin[2] and its possible side effects. Jared notes that Sarah experienced symptoms consistent with the hazards associated with the use of Griseofulvin, such as peripheral neuropathy, elevated liver enzymes, vomiting, mental impairment, and lupus-like symptoms.

As for Dr. Medina, Jared claims that she was unfamiliar with Sarah's medical history and used selective medical and scientific evidence to support her conclusions. Jared similarly argues that Dr. Medina failed to consider that Sarah's use of Griseofulvin. In addition, Jared argues that Dr. Medina used Sarah's unreliable interview to support her theory of causation.

Jared further argues that the opinions of Dr. Kairys and Dr. Medina "extended beyond their expertise, lacked a scientific foundation and

---

[2] Griseofulvin is an anti-fungal medication. In his report, Dr. Kairys noted that Sarah had been taking Griseofulvin for a tinea capitis infection that was causing "some hair loss" on her scalp.

A-0877-19

contradicted each other." Jared's arguments lack sufficient merit to warrant extended discussion. R. 2:11-3(e)(1)(E).

"[A] witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." N.J.R.E. 702. Pertinent to this appeal, in order for expert testimony to be admissible," the field testified to must be at a state of the art that an expert's testimony could be sufficiently reliable" and "the witness must have sufficient expertise to offer the intended testimony." State v. Townsend, 186 N.J. 473, 491 (2006) (quoting State v. Torres, 183 N.J. 554, 567-68 (2005)). "Courts can accept scientific theories as reliable when they are based on a sound methodology that involves 'data and information of the type reasonably relied on by experts in the scientific field.'" A.L., 213 N.J. at 28 (quoting State v. Moore, 188 N.J. 182, 206 (2006)).

An expert's opinion must be "based on 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence, but which is the type of data normally relied upon by experts in forming opinions on the same subject.'" Townsend, 186 N.J. at 494 (quoting Biunno, N.J. Rules of Evidence 896 (2005)). Here, the Division investigation report, hospital

records, ophthalmic consultation report, and imaging studies relied upon by Drs. Medina and Kairys were admitted in evidence.

Dr. Kairys was qualified as an expert in pediatrics and child abuse, allowing him to testify about his review of Sarah's records. The court found Dr. Kairys "highly credible." Contrary to Jared's argument, Dr, Kairys was familiar with Sarah's medical history.

As for Dr. Medina, the court qualified her as an expert in pediatrics and child abuse pediatrics, and she testified extensively about her review of Sarah's medical records. The court also found her "highly credible." Notably, Jared's experts did not opine that Griseofulvin's possible side effects caused Sarah's symptoms or injuries.

Despite Jared's attempts to question the legitimacy of Dr. Medina's designation as a Child Abuse Specialist, it is a Board-certified specialty recognized by the American Board of Pediatrics that requires initial certification, testing every seven years, and ongoing training. Dr. Kairys also holds this certification.

As for the use of Sarah's forensic interview, Jared offered it into evidence, not the Division. Sarah's statements that Jared grabbed her leg and shoulder and

27

shook her were sufficiently corroborated and were supported by the expert testimony and medical findings.

Regarding Jared's claim that the judge failed to resolve material conflicts in the opinions of Dr. Kairys and Dr. Medina, there is substantial, credible evidence to support the trial court's conclusion that Jared abused or neglected Sarah within the meaning of N.J.S.A. 9:6-8.21(c)(1) and (4)(b). Drs. Kairys, Medina, and Scheller consistently dated the brain injuries as occurring on November 17, 2017. Examination, imaging studies, and testing revealed she suffered brain tissue and nerve cell damage, subdural bleeding, multi-layer retinal hemorrhages, trauma to her spleen, liver, and pancreas, and bruising to her thigh. Both Dr. Medina and Dr. Kairys determined that these injuries were non-accidental and occurred when Jared was acting as Sarah's sole caretaker on the evening of her hospitalization.

In addition, after Sarah awoke from her medically induced coma, she told the Division that she did not remember falling in the bathtub but recalled instead Jared hitting her, shaking her, and telling her to stop talking. Jared's recollection of events was inconsistent with the injuries Sarah experienced, and he provided no plausible non-accidental explanation for Sarah's injuries.

A-0877-19

Moreover, whether Sarah's injuries stemmed from "shaking with impact" or just shaking does not refute the fact that the abusive head trauma was caused by Jared while he was Sarah's sole caretaker the night of her hospitalization. Although Dr. Medina found no evidence of bruising or sub-tissue swelling to indicate an impact against a solid surface, she explained that children can sustain head injuries without external physical evidence by impacting "a bed, pillow, [or] something harder that's not solid."

In addition, Jared takes issue with the court's assessment of Dr. Scheller's testimony. Jared emphasizes that Dr. Kairys has extensive experience in pediatrics but none in neurology—unlike Dr. Scheller, who has been a pediatric neurologist for decades. We defer to the judge's detailed credibility finding as he heard and saw Dr. Scheller's testimony and thus "ha[d] the opportunity to make first-hand credibility judgments" about him. E.P., 196 N.J. at 104.

In sum, we discern no basis to disturb the determination that Jared abused and neglected Sarah within the meaning of N.J.S.A. 9:6-8.21(c)(1) and 4(b). Our careful review of the record reveals that Judge Katz's factual findings and credibility determinations are amply supported by substantial, competent, credible evidence in the record, and his conclusions are consonant with applicable legal standards.

29

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0877-19